UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
PENTAIR WATER TREATMENT (OH)
COMPANY (formerly known as
ESSEF CORPORATION) and
PENTAIR WATER POOL & SPA, INC.
(formerly known as PAC-FAB,
INC.) and PENTAIR WATER BELGIUM
BVBA (formerly known as STRUCTURAL
EUROPE N.V. formerly known as SFC),

                        Plaintiffs,

                                            08 Civ. 3604 (BSJ)


            -against-


FIDELITY & CASUALTY INSURANCE
COMPANY OF NEW YORK and
CNA INSURANCE COMPANIES,

                        Defendants.
-----------------------------------------------------x

## DEFENDANTS' NOTICE OF MOTION
## TO DISMISS THE COMPLAINT

        PLEASE TAKE NOTICE that upon the accompanying declaration of Robert M.

Kaplan, dated June 5, 2008 and the accompanying memorandum of law, defendants The

Continental Insurance Company, as successor by merger to defendant Fidelity &

Casualty Insurance Company of New York ("Fidelity") and CNA Insurance Companies

will move this Court before the Honorable Barbara S. Jones, United States District Judge,

at the United States Courthouse, 500 Pearl Street, New York, New York, on June 30,

2008 for an order, for an order (i) pursuant to F.R.C.P. 12(b)(6), dismissing the third

claim for relief in the complaint on the ground it fails to state a claim upon which relief

can be granted and (ii) pursuant to F.R.C.P. 12(b)(6) and 17(b), dismissing CNA

74345

Insurance Companies as a defendant on the ground it lacks the capacity to be sued in this action.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 6.1(b) of this Court, opposing papers, if any, are to be served by June 19, 2008.

Dated: New York, New York
       June 5, 2008

FERBER CHAN ESSNER & COLLER, LLP

By: __/s/Robert M. Kaplan__
       Robert M. Kaplan (RK1428)
Attorneys for Defendants
530 Fifth Avenue
New York, New York 10036-5101
(212) 944-2200

TO:

ANDERSON KILL & OLICK, P.C.
Attorneys for Plaintiffs
1251 Avenue of the Americas
New York, New York  10020
(212) 278-1000

74345

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PENTAIR WATER TREATMENT (OH)
COMPANY (formerly known as
ESSEF CORPORATION) and
PENTAIR WATER POOL & SPA, INC.
(formerly known as PAC-FAB,
INC.) and PENTAIR WATER BELGIUM
BVBA (formerly known as STRUCTURAL
EUROPE N.V. formerly known as SFC),

                     Plaintiffs,

                                         08 Civ. 3604 (BSJ)

       -against-

FIDELITY & CASUALTY INSURANCE
COMPANY OF NEW YORK and
CNA INSURANCE COMPANIES,

                     Defendants.
-------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

The Complaint…………………………………………………………2

Background…………………………………………………………….2

The Claims For Relief………………………………………………5

**ARGUMENT**………………………………………………………….6

I.

THE THIRD CLAIM FOR RELIEF IN THE COMPLAINT
MUST BE DISMISSED AS PLAINTIFFS HAVE NOT
ALLEGED A VIABLE CLAIM UNDER GBL §349………………………6

A.  Plaintiffs Have Failed To Allege That
    The Conduct Of Which They Complain
    Took Place In New York…………………………………………....7

B.  Plaintiffs Have Failed To Allege That
    Their Claim Arises Out Of
    Consumer-Oriented Conduct…………………………………………..10

C.  Plaintiffs Cannot Pursue Any Remedy
    Under Insurance Law §2601…………………………………………...13

II.

CNA INSURANCE COMPANIES MUST BE
DISMISSED AS A DEFENDANT, AS IT
LACKS THE CAPACITY TO BE SUED…………………………………..13

**CONCLUSION**………………………………………………………15

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
PENTAIR WATER TREATMENT (OH)
COMPANY (formerly known as
ESSEF CORPORATION) and
PENTAIR WATER POOL & SPA, INC.
(formerly known as PAC-FAB,
INC.) and PENTAIR WATER BELGIUM
BVBA (formerly known as STRUCTURAL
EUROPE N.V. formerly known as SFC),

                       Plaintiffs,

                                  08 Civ. 3604 (BSJ)

       -against-

FIDELITY & CASUALTY INSURANCE
COMPANY OF NEW YORK and
CNA INSURANCE COMPANIES,

                       Defendants.
-----------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants The Continental Insurance Company, as successor by merger to

defendant Fidelity & Casualty Insurance Company of New York ("Fidelity") and CNA

Insurance Companies ("CNA") respectfully submit the within memorandum of law in

support of their motion for an order (i) pursuant to F.R.C.P. 12(b)(6), dismissing the

third claim for relief in the complaint (Exhibit A)[*] on the ground it fails to state a claim

upon which relief can be granted and (ii) pursuant to F.R.C.P. 12(b)(6) and 17(b),

---

[*] The referenced exhibits are attached to the accompanying declaration of Robert M. Kaplan.

dismissing CNA as a defendant on the ground it lacks the capacity to be sued in this action.

Defendants' motion should be granted because plaintiffs' third claim for relief fails to set forth a viable cause of action and because defendant CNA, a putative "unincorporated association", lacks the capacity to be sued in this action. Plaintiffs, in their third claim for relief, have attempted to transform a garden-variety insurance coverage dispute involving a single claim under a single policy into an alleged case of consumer deception under New York's General Business Law §349. However, plaintiffs, all of whom are industrial corporations and nonresidents of New York, fail to allege the *sine qua non* of a claim under §349 -- they fail to allege that the allegedly offending transactions took place in New York and they fail to allege any consumer-oriented conduct. In addition, plaintiffs cannot pursue any claims against CNA because it has not been properly made a party to this case.

## THE COMPLAINT

### Background

Plaintiffs are all industrial corporations who reside outside of New York. Plaintiff Pentair Water Treatment (OH) Company (formerly known as Essef Corporation) is an Ohio corporation with its principal place of business in Ohio (Complaint ¶3). Plaintiff Pentair Water Pool & Spa, Inc. (formerly known as Pac-Fab, Inc.) is a Delaware corporation with its principal place of business in North Carolina (Complaint ¶4). Plaintiff Pentair Water Belgium BVBA (formerly known as Structural

Europe N.V., formerly known as SFC) has its principal place of business in Herentals, Belgium (Complaint ¶5).

Plaintiffs allege that Fidelity is incorporated in New Hampshire and maintains its principal place of business in New York (Complaint ¶6). Plaintiffs allege, upon information and belief, that CNA is an "unincorporated association" of insurance companies, including Fidelity, doing business in New York (Complaint ¶7).

Plaintiffs alleged that defendants sold them an excess umbrella liability insurance which only requires payment for losses covered by that policy and only after the limits of underlying policy have been exhausted (Complaint ¶10). Plaintiffs allege that Fidelity issued policy no. CXU-001807 (the "Policy") which was in effect from June 1, 1994 through June 1, 1995 (Complaint ¶11). Plaintiffs do not allege to whom the Policy was issued or which of them was an insured under the Policy. The text of the Policy (Exhibit B) identifies only Essef Corp. ("Essef") as an insured. Plaintiffs do not allege that the Policy was brokered, sold or issued in New York.

Plaintiffs allege that the Policy has per-occurrence and annual aggregate limits of $10,000,000.00. Plaintiffs allege that the Policy sits above an umbrella policy issued by Westchester Fire Insurance Company (the "Westchester Policy") which has per-occurrence and annual aggregate limits of $15,000,000.00 (Complaint ¶__); a copy of the Westchester Policy is Exhibit C.

Plaintiffs allege that they have been defendants in a litigation (the "Underlying Litigation") stemming from an outbreak of Legionnaires' disease on or about July 16, 1994 aboard a cruise ship owned and operated by a predecessor to Celebrity Cruise Lines, Inc. ("Celebrity") (Complaint ¶¶ 15-16).

Plaintiffs allege that cruise ship passengers brought suit against Celebrity and plaintiffs; plaintiffs had manufactured and distributed the filter in the whirlpool spa where the disease originated. Plaintiffs allege that Celebrity brought cross-claims against them seeking recovery of attorney's fees, out-of-pocket cost and expenses, lost profits and lost enterprise value (Complaint ¶¶ 16-17).

Plaintiffs allege that the liability issues in the Underlying Litigation were tried in a single trial in May 2000. Plaintiffs allege that a jury found in favor of the passengers and against both Celebrity and plaintiffs and also found in Celebrity's favor on some of its claims against plaintiffs (Complaint ¶18).

Plaintiffs allege that in June 2006, in the damage phase of Celebrity's claims against plaintiffs, a jury returned a verdict against plaintiffs which the court partially set aside (Complaint ¶19). Plaintiffs did not provide notice of this verdict to defendants until a letter dated December 11, 2006 (Complaint ¶25; Exhibit D). This letter was written solely on behalf of Essef by the Ohio law firm of Roetzel & Andress, LPA and was sent to "CNA International" in Chicago, Illinois.

Plaintiffs allege that in letters to Defendants dated April 19, 2007 and May 21, 2007, they requested written confirmation that coverage would be provided under the Policy (Complaint ¶25). By a letter dated September 21, 2007 (Exhibit E), defendants advised plaintiffs that there was no coverage under the Policy because of: the pollution exclusion in the Policy; the application of the foreign follow-form endorsement in the Policy; and the failure to exhaust the underlying limits. This letter was written on behalf of Fidelity by the Cleveland, Ohio law firm of Reminger Co., LPA and was sent to Roetzel & Andress' Akron, Ohio office. Not until January 23, 2008 in a letter sent by

Roetzel & Andress to Reminger Co., did plaintiffs respond to defendants' denial of coverage (Complaint ¶30) (Exhibit F).

Plaintiffs allege that a second trial on damages was held in June 2007 and that on February 29, 2008, Celebrity entered a final judgment against them in the total amount of $30,435,226.00 (Complaint ¶¶19-20). Plaintiffs allege that on March 5, 2008, in a letter from Roetzel & Andress to Reminger, they notified defendants that they had to post a bond to stay execution of the judgment and requested that Fidelity post a bond (Complaint ¶31; Exhibit G). Plaintiffs allege that on March 27 and April 10, 2008, defendants reiterated the denial of coverage and informed plaintiffs that they had no obligation to post a bond in connection with this appeal (Complaint ¶¶ 33, 35); Exhibits H and I). These letters were sent by Reminger to Roetzel & Andress.


**The Claims For Relief**

Plaintiffs have alleged three claims for relief in this action: a claim seeking a declaratory judgment; a claim seeking damages for breach of contract; and a claim alleging violations of New York General Business Law §349 and New York Insurance Law §2601.

Plaintiffs, in their first claim for relief (Complaint ¶¶ 36-40), allege they are entitled to a declaratory judgment that they are entitled to insurance coverage under the Policy, including a bond, for the losses sustained in the Underlying Litigation.

Plaintiffs, in their second claim for relief (Complaint ¶¶ 41-50), allege that Defendants have breached the Policy by failing to honor the Policy's terms and failing to

74227                                    5

supply Plaintiffs with a bond and the full limits of the Policy.  Plaintiffs allege that

Defendants are liable for compensatory and consequential damages due to this breach.

Plaintiffs, in their third claim for relief (Complaint ¶¶ 51-73), have attempted to

transform this garden-variety insurance coverage dispute into alleged violations of GBL

§349 and Insurance Law §2601.  Plaintiffs allege that defendants engaged in deceptive

acts and practices, prohibited by GBL §349, by failing to effectuate a prompt, fair and

equitable settlement of plaintiffs' claim even where liability is reasonably clear

(Complaint ¶¶ 56, 70).

## ARGUMENT

## I.

## THE THIRD CLAIM FOR RELIEF IN THE COMPLAINT MUST BE DISMISSED AS PLAINTIFFS HAVE NOT ALLEGED A VIABLE CLAIM UNDER GBL §349

Plaintiffs' effort, in their third claim for relief, to transform a routine insurance

coverage dispute involving a single claim under a single policy into an alleged case of

"consumer deception" must be deemed a failure because plaintiffs have failed to allege a

viable cause of action under GBL §349.  Plaintiffs have failed to allege two essential

elements of a viable cause of action under §349 -- they have not alleged that the conduct

of which they complain took place in New York and they have not alleged that their

claim arises out of "consumer-oriented" conduct.  Moreover, Plaintiffs cannot salvage

their pleading by relying on Insurance Law §2601, because there is no private cause of

action under that statute.  As a result, the third claim for relief must be dismissed.

**A. Plaintiffs Have Failed To Allege That
The Conduct Of Which They Complain
Took Place In New York**

GBL §349 prohibits "[d]eceptive acts or practices in the conduct of any business,

trade or commerce or in the furnishing of any service *in this state* …" (emphasis

supplied). The New York Court of Appeals has ruled that this statute is designed "to

protect consumers in their transactions that take place in New York State. It was not

intended to police out-of-state transactions of New York companies…" Goshen v.

Mutual Life Ins. Co. of New York, 98 N.Y.2d 314, 325, 746 N.Y.S.2d 858, 864 (2002).

As a result, the New York Court of Appeals has ruled that "to qualify as a prohibited act

under the statute, the deception of a consumer must occur in New York." Id. In

accordance with this definitive ruling, the courts have repeatedly ruled that where the

plaintiff has failed to allege that the deceptive practices which allegedly injured the

plaintiff took place in New York, the plaintiff is not permitted to pursue a claim under

§349.

In Goshen, the plaintiff claimed that the defendants had violated §349 by selling

"vanishing premium" insurance policies. The plaintiff alleged that the "vanishing

premium" concept was conceived and orchestrated by the defendants in New York.

However, the plaintiff, a Florida resident, admitted that he received the defendants'

information in Florida and that he purchased his policy and paid his premiums in

Florida. As a result, "for purposes of section §349, any deception took place in Florida,

not New York" and therefore the plaintiff did not state a cognizable cause of action

under §349. 98 N.Y.2d at 326, 746 N.Y.S.2d at 864.

In <u>Wiener v. Unumprovident Corp.</u>, 202 F.Supp.2d 116 (S.D.N.Y. 2002), the

plaintiff, who claimed that the defendants had improperly discontinued paying benefits

under group and individual disability insurance policies, asserted a claim under §349.

Although the plaintiff had submitted her applications for the policies in New York, she

resided in New Jersey, the benefits were paid to her in New Jersey and the claimhandling

at issue took place outside of New York.  As a result, the court held that the defendants'

allegedly deceptive practices had not taken place in New York and the plaintiff could not

pursue a §349 claim.  202 F.Supp.2d at 120-21.

In <u>Gavin v. AT&T Corp.</u>, 2008 WL 400697 (N.D.Ill. 2008), the plaintiff alleged

that a notice sent to AT&T shareholders concerning an exchange of stock certificates

was false and misleading and constituted, *inter alia*, a violation of §349.  The plaintiff

claimed that the offending act took place in New York because AT&T and its

shareholders services firm, Georgeson, had offices in New York, Georgeson sent notices

to shareholders from New York and that notice told shareholders to mail their

certificates and fees to New York.  The court rejected the plaintiff's argument and

dismissed her §349 claim, ruling that "the deception (if any) occurred in Illinois where

Plaintiff received the December 2000 notice and relied on it to exchange her shares

through Georgeson."

In <u>Thomas v. Metropolitan Life Ins. Co.</u>, 540 F.Supp.2d 1212 (W.D. Okla. 2008),

the plaintiffs brought various claims against Met Life based upon its alleged failure to

disclose its conflicts of interest when it sold various financial products.  The plaintiffs,

none of whom resided in New York, alleged, *inter alia*, that Met Life's conduct violated

§349.  However, there were no allegation that any of the plaintiffs' purchases of Met

Life's products were made in New York or that any of the transactions at issues took place in New York. The only direct reference to New York in the complaint was that Met Life was headquartered there. The court held that the §349 claim had to be dismissed because there were insufficient allegations of any deception in New York. 540 F.Supp.2d at 1227.

     *See also*, Bezuszka v. L.A. Models, Inc., 2006 WL 770526, *15 (S.D.N.Y. 2006) (§349 claim deficient because it failed to "allege that any deception occurred in New York"), Rey-Willis v. Citibank, N.A., 2004 WL 315267, *1 (S.D.N.Y. 2004) (id.).

     These principles, applied to the allegations in the complaint, compel the conclusion that plaintiffs' claim under §349 must be dismissed because they have failed to allege that there was any deceptive conduct which took place in New York. Although plaintiffs' complaint is far from crystal-clear, it appears that the "deception" of which they complain is defendants' alleged promotion and sale of insurance policies without disclosing that they do not maintain fair and reasonable claims settlement practices and defendants' failure to supply them with coverage under the Policy (Complaint ¶¶ 56, 58, 59, 70). However, plaintiffs fail to allege that any of this conduct took place in New York. Plaintiffs all admit that they maintain their principal places of business outside New York. Plaintiffs do not allege that they were solicited by defendants in New York for the sale of the Policy. Plaintiffs do not allege that they ever met with defendants in New York concerning the Policy. Plaintiffs do not allege that they purchased the Policy in New York. Plaintiffs do not allege that they paid premiums for the Policy in New York. Plaintiffs do not allege that they ever corresponded with defendants in New York concerning the Policy or the Underlying Litigation. Plaintiffs do not allege that any of

the claims handling of which they complain took place in New York. There is
absolutely no allegation of any conduct by defendants in New York, much less any
conduct that allegedly deceived plaintiffs.

The cases cited above make clear that in the absence of sufficient allegations of
deception by the defendant in New York, a §349 claim cannot survive a threshold
motion to dismiss. Since plaintiffs' pleading contains absolutely no allegations of any
deception in New York, plaintiffs' claim under §349 must be dismissed.

## B. Plaintiffs Have Failed To Allege That Their Claim Arises Out Of Consumer-Oriented Conduct

Plaintiffs' attempted claim under §349 must also fail because plaintiffs have
failed to allege that their claim arises out of consumer-oriented conduct. The New York
Court of Appeals has held that a viable claim under §349 must specifically relate to
consumer-oriented conduct. Oswego Laborers' Local 214 Pension Fund v. Marine
Midland Bank, 85 N.Y.S.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995). The New York
Court of Appeals has held that an insurer's handling of an insurance policy or of claims
submitted under an insurance policy did not constitute consumer-oriented conduct
necessary to sustain a claim of deceptive business practices under GBL §349. New York
University v. Continental Ins. Co., 87 N.Y.2d 308, 320-21, 639 N.Y.S.2d 283, 290-91
(1995). "Private contract disputes regarding policy coverage and the processing of a
claim that is unique to the parties does not fall within the ambit of General Business Law
§349." Fekete v. GA Ins. Co. of New York, 279 A.D.2d 300, 719 N.Y.S.2d 52, 53 (1st
Dep't 2001). A plaintiff asserting a claim under §349 must allege injury to the public
generally, not just itself. Int'l Sport Divers Ass'n, Inc. v. Marine Midland Bank, N.A.,

25 F.Supp.2d 101, 114 (W.D.N.Y. 1998); see Novogroder/San Bernardino, L.L.C. v.

Cohen Realty Services, Inc., 2000 WL 556621, *6 (N.D.Ill. 2000) (The complaint

"alleges no facts that would indicate that anyone other than plaintiff would be injured by

a breach of the contracts" with the defendants).  Numerous courts have similarly held

that a plaintiff cannot allege a viable claim under §349 by asserting a routine insurance

coverage dispute and contending, in entirely conclusory language, that this dispute is part

of a wider unfair claims settlement policy.  Perfect Dental, PLLC v. Allstate Ins. Co.,

2006 WL 2552171, *2-3 (E.D.N.Y. 2006), USAlliance Federal Credit Union v. Cumis

Ins. Society, 346 F.Supp.2d 468, 472 (S.D.N.Y. 2004), Lava Trading Inc. v. Hartford

Fire Ins. Co., 326 F.Supp.2d 434, 438-39 (S.D.N.Y. 2004), Oboler v. Ins. Co. of North

America, 1994 WL 414438, *3-4 (S.D.N.Y. 1994), Grand General Stores, Inc. v. Royal

Indemnity Co., 1994 WL 163973, *3-4 (S.D..N.Y. 1994), Tinlee Enterprises, Inc. v.

Aetna Casualty & Surety Co., 834 F.Supp. 605, 608-10 (E.D.N.Y. 1993).

In addition, courts applying New York law have indicated that a consumer, for

§349 purposes, is one who purchases "goods and services for personal, family or

household use."  ExxonMobil Inter-America, Inc. v. Advanced Information Engineering

Services, Inc., 328 F.Supp.2d 443, 448 (S.D.N.Y. 2004), Sheth v. N.Y. Life Ins. Co., 273

A.D.2d 72, 709 N.Y.S.2d 74 (1st Dep't 2000).  Moreover, "New York courts have

generally found that business-to-business transactions do not give rise to §349 claims."

ExxonMobil Inter-America, id.  As the court stated in Genesco Entertainment v. Koch,

593 F.Supp. 743, 752 (S.D.N.Y. 1984),

> "[T]ransactions involving complex arrangements,
> knowledgeable and experienced parties and large
> sums of money…are different in kind and degree

> from those that confront the average consumer who
> requires that protection of a statute against
> fraudulent practices."

These precedents, applied to the facts of this case, require the conclusion that plaintiffs' §349 claim does not involve consumer-oriented conduct and therefore must be dismissed. Plaintiffs' cause of action under §349 is based exclusively upon an insurance coverage dispute involving a single claim under a single policy -- exactly what the courts have repeatedly held does not amount to consumer-oriented conduct. Plaintiffs do not allege that anyone else will be injured if defendants do not supply them with coverage, under a single excess umbrella liability policy, for claims arising out of a single outbreak of Legionnaire's disease aboard a single cruise ship.

Moreover, plaintiffs' claim does not involve any goods and services acquired for personal, family or household use; instead, it involves insurance coverage for three industrial corporations whose operations span at least two continents. What is at issue here is a sophisticated transaction among sophisticated parties involving large sums of money. The Policy was issued by a major property/casualty insurer and plaintiffs, who purport to be insureds under that Policy, are sophisticated industrial corporations whose operations span at least two continents. Millions of dollars were involved in the underlying transaction and are at issue here; the Policy has limits of $10,000,000 and sits above the Westchester Policy, which has limits of $15,000,000 and sits above a primary insurance policy with limits of $725,000 per occurrence/$2,000,000 general aggregate. Furthermore, plaintiffs claim that they are entitled to recover the full limits of the Policy. Plaintiffs have been represented by outside professionals at every step of the way with regard to the Policy; the Policy was obtained through an insurance broker located in

Chicago, Illinois and plaintiffs, in their communications with defendants concerning the Policy and Underlying Litigation, were represented by a large Ohio law firm. All of these undisputed facts compel the conclusion that this is precisely the kind of sophisticated commercial transaction which falls outside the perview of §349.

## C. Plaintiffs Cannot Pursue Any Remedy Under Insurance Law §2601

Although plaintiffs have alleged that defendants violated Insurance Law §2601 by "fail[ing] to effectuate a prompt, fair and equitable settlement of Plaintiffs' claim even where liability is reasonably clear" (Complaint §56), that statute does not afford plaintiffs any independent remedy here. It is black-letter law that there is no private cause of action under §2601. Rocanova v. Equitable Life Ass. Society of the United States, 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343 (1994)("[T]he law of this State does not currently recognize a private cause of action under Insurance Law §2601"), Guideone Specialty Mut. Ins. Co. v. Congregation Bais Yisroel, 381 F.Supp.2d 267, 282 (S.D.N.Y. 2005) (id.), Sterbenz v. Attina, 205 F.Supp.2d 65, 70-71 (S.D.N.Y. 2002) (id.). As a result, plaintiffs cannot pursue any independent remedy under Insurance Law §2601.

## II.

## CNA INSURANCE COMPANIES MUST BE DISMISSED AS A DEFENDANT, AS IT LACKS THE CAPACITY TO BE SUED

Although plaintiffs have not alleged any facts that this case is anything other than a routine insurance coverage dispute involving a single claim under a single policy issued by a single insurer, plaintiffs have nevertheless attempted to assert claims against

13

CNA, which is not a party to the Policy and was never referred to in any of Defendants'

correspondence.  However, CNA must be dismissed as a defendant as it lacks the

capacity to be sued.[*]  Plaintiffs have failed to sue CNA in the manner prescribed by New

York law, which is controlling here, and therefore it has to be dismissed as a defendant.

Plaintiffs have alleged, in paragraph 7 of the complaint, that CNA is an

"unincorporated association."  Under F.R.C.P. 17(b), the capacity of an unincorporated

association to be sued is determined by the law of the state where the court is located.

New York's General Associations Law §13, which is entitled "Action or proceeding

against unincorporated association," provides, in relevant part, as follows:

> An action or special proceeding may be maintained,
> against the president or treasurer of such an association, to
> recover any property, or upon any cause of action, for or
> upon which the plaintiff may maintain such an action or
> special proceeding, against all the associates, by reason of
> their interest or ownership, or claim of ownership therein,
> either jointly or in common, or their liability therefore,
> either jointly or severally…

Courts applying New York law have concluded that these provisions are *mandatory* and

that an unincorporated association can *only* be sued in the name of its president or

treasurer.  Markewich v. Adikes, 422 F.Supp. 1144, 1147 (S.D.N.Y. 1976), Motor

Haulage Co. v. Int'l Brotherhood of Teamsters, 298 N.Y. 208, 211 (1948).

These principles, applied here, require CNA's dismissal as a defendant.  Since

plaintiffs have alleged that CNA is an unincorporated association, it can only be sued in

the name of its president or treasurer.  However, plaintiffs have not sued CNA in the

---

[*] There is case law that there is no legal entity named CNA Insurance Companies.  Thompson Hardwoods, Inc. v. Transportation Ins. Co., 2002 WL 440222, *4 n. 3 (S.D. Ind. 2002).

name of any alleged president or treasurer; indeed, there is no mention of CNA's alleged

president or treasurer anywhere in the summons or complaint.[*]  Plaintiffs have also not

offered any explanation as to how a nonparty to an insurance contract, like CNA, can

possibly be liable under that insurance contract.  Accordingly, in the absence of

compliance with General Associations Law §13, plaintiffs cannot sue CNA in this action

and therefore it has to be dismissed as a defendant.


## CONCLUSION

Therefore, for all the reasons set forth above, it is respectfully requested that

defendants' motion to dismiss the complaint be granted in all respects and that the third

cause of action be dismissed and CNA be dismissed as a defendant.


Dated: New York, New York
     June 5, 2008

               FERBER CHAN ESSNER & COLLER, LLP

               By: /s/_Robert M. Kaplan_____
                  Robert M. Kaplan (RK1428)
               Attorneys for Defendants
               530 Fifth Avenue
               New York, New York 10036-5101
               (212) 944-2200

---

[*] Nor could there be; since "CNA Insurance Companies" does not exist as a legal entity, it has no president or treasurer.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PENTAIR WATER TREATMENT (OH)
COMPANY (formerly known as
ESSEF CORPORATION) and
PENTAIR WATER POOL & SPA, INC.
(formerly known as PAC-FAB,
INC.) and PENTAIR WATER BELGIUM
BVBA (formerly known as STRUCTURAL
EUROPE N.V. formerly known as SFC),

                       Plaintiffs,

                                  08 Civ. 3604 (BSJ)

           -against-

FIDELITY & CASUALTY INSURANCE
COMPANY OF NEW YORK and
CNA INSURANCE COMPANIES,

                       Defendants.
-------------------------------------------------------x

## DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ROBERT M. KAPLAN, under penalty of perjury, declares as follows:

1.      I am an attorney at law, admitted to practice before this Court and a

member of Ferber Chan Essner & Coller, LLP, attorneys for defendants The Continental

Insurance Company, as successor by merger to defendant Fidelity & Casualty Insurance

Company of New York ("Fidelity") and CNA Insurance Companies.

2.      I submit this declaration to set forth certain exhibits in support of

defendants' motion for an order (i) pursuant to F.R.C.P. 12(b)(6), dismissing the third

claim for relief in the complaint (Exhibit A) on the ground it fails to state a claim upon

74337

which relief can be granted and (ii) pursuant to F.R.C.P. 12(b)(6) and 17(b), dismissing CNA Insurance Companies as a defendant on the ground it lacks the capacity to be sued in this action.

3.      These exhibits consist of the complaint and certain documents referenced in the complaint.

4.      Attached as Exhibit A is a copy of plaintiffs' complaint, dated April 15, 2008.

5.      Attached as Exhibit B is a copy of an excess umbrella liability insurance policy issued by Fidelity covering the policy period June 1, 1994 to June 1, 1995, policy no. CXU-001807.

6.      Attached as Exhibit C is a copy of an umbrella liability insurance policy issued by Westchester Fire Insurance Co. covering the policy period June 1, 1994 to June 1, 1995, policy no. CUA 1002970.

7.      Attached as Exhibit D is a copy of a letter dated December 11, 2006 from Ronald B. Lee of Roetzel & Andress, LPA to "CNA International."

8.      Attached as Exhibit E is a copy of a letter dated September 21, 2007 from Clifford C. Masch of Reminger & Reminger Co., LPA to Megan Faust of Roetzel & Andress, LPA.

9.      Attached as Exhibit F is a copy of a letter dated January 23, 2008 from Laura M. Faust of Roetzel & Andress, LPA to Clifford C. Masch of Reminger Co., LPA.

10.     Attached as Exhibit G is a copy of a letter dated March 6, 2008 from Laura M. Faust of Roetzel & Andress, LPA to Clifford C. Masch of Reminger Co., LPA.

11.    Attached as Exhibit H is a copy of a letter dated March 27, 2008 from

Clifford C. Masch of Reminger Co., LPA to Megan Faust of Roetzel & Andress, LPA.

12.    Attached as Exhibit I is a copy of a letter dated April 14, 2008 from

Clifford C. Masch of Reminger Co., LPA to Megan Faust of Roetzel & Andress, LPA.

13.    Therefore, for all the reasons set forth in the accompanying memorandum

of law, it is respectfully requested that defendants' motion be granted in all respects.


Dated:   New York, New York
          June 5, 2008


                                        /s/Robert M. Kaplan__
                                        ROBERT M. KAPLAN

# Exhibit A

*Dear Denis accepted service at CNA Chicago IL*

*No 5/6*

AO 440 (Rev. 10/93 ) Summons in a Civil Case – SDNY WEB 4/99

JUDGE JONES

# United States District Court

| Southern | **DISTRICT OF** | New York |
|---|---|---|

PENTAIR WATER TREATMENT (OH) COMPANY
(FORMERLY KNOWN AS ESSEF CORPORATION)
and
PENTAIR WATER POOL & SPA, INC. (FORMERLY
KNOWN AS PAC-FAB, INC.)
and
PENTAIR WATER BELGIUM BVBA (FORMERLY
KNOWN AS STRUCTURAL EUROPE N.V. FORMERLY
KNOWN AS SFC)

Plaintiffs

v.

FIDELITY & CASUALTY INSURANCE COMPANY OF
NEW YORK
and
CNA INSURANCE COMPANIES

Defendants

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

**08 CIV 3604**

RECD APR 17 2008    **RECEIVED**
APR 16 2008
**LAW DEPT.**

TO:    Fidelity & Casualty Insurance
Company of New York
180 Maiden Lane
New York, NY 10038

CNA INSURANCE COMPANIES
CNA Plaza-32 South
Chicago, IL 60685

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

**E & MT CLAIMS**
APR 18 2008

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a
reasonable period of time after service.

## J. MICHAEL McMAHON

APR 1 5 2008

CLERK

DATE

(BY) DEPUTY CLERK

JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK    '08 CIV 3604

PENTAIR WATER TREATMENT (OH)
COMPANY (FORMERLY KNOWN AS
ESSEF CORPORATION)

and

PENTAIR WATER POOL & SPA, INC.
(FORMERLY KNOWN AS PAC-FAB,
INC.)

and

PENTAIR WATER BELGIUM BVBA
(FORMERLY KNOWN AS STRUCTURAL
EUROPE N.V. FORMERLY KNOWN AS
SFC)

                                    Plaintiffs,

            - against -

FIDELITY & CASUALTY INSURANCE
COMPANY OF NEW YORK

and

CNA INSURANCE COMPANIES

                                    Defendants.



**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. _____

Plaintiffs Pentair Water Treatment (OH) Company (f/k/a Essef

Corporation) ("Essef"), Pentair Water Pool & Spa, Inc. (f/k/a Pac-Fab, Inc.) ("Pac-Fab")

and Pentair Water Belgium BVBA (f/k/a Structural Europe N.V. f/k/a SFC) ("SFC")

(collectively "Plaintiffs") hereby bring this lawsuit against Fidelity & Casualty Insurance

Company of New York ("Fidelity") and the unincorporated association of insurance

companies collectively doing business by the fleet name "CNA Insurance Companies"

("CNA") (jointly "Defendants") and state as follows:

NYDOCS1-887840.4

## NATURE OF THE LAWSUIT

1.     This Complaint is for declaratory relief and breach of contract arising out of Fidelity and CNA's wrongful denial and refusal to provide coverage under a comprehensive general liability insurance policy for losses suffered by Plaintiffs in the wake of a Legionnaires' disease outbreak aboard a cruise ship operated by Celebrity Cruise Lines, Inc. ("Celebrity") in the summer of 1994.

2.     Plaintiffs have brought this Complaint to enforce their rights to full coverage for their losses, and seek a declaration that Fidelity and CNA have obligations to provide coverage, including providing a bond, to Plaintiffs for the losses sustained from the outbreak and the resulting litigation and judgment (the "*Horizon* Cruise Ship Litigation"); for breach of the insurance policy sold by Fidelity and CNA; for consequential damages caused by such breach; and for damages caused by the Defendants' violation of New York State General Business Law § 349.

## THE PARTIES

3.     Essef is incorporated in Ohio with its principal place of business in Chardon, Ohio.

4.     Pac-Fab, currently known as Pentair Water Pool & Spa, Inc., is incorporated in Delaware and has its principal place of business in Sanford, North Carolina.

5.     SFC, formerly known as Structural Europe N.V. and currently known as Pentair Water Belgium BVBA, has its principal place of business in Herentals, Belgium.

6.    Upon information and belief, Fidelity is incorporated in New Hampshire and maintains its principal place of business in New York, New York.

7.    Upon information and belief, CNA is an unincorporated association of insurance companies that includes Fidelity doing business in New York.

## JURISDICTION AND VENUE

8.    This lawsuit is commenced pursuant to 28 U.S.C. § 1332, upon the grounds that there is complete diversity between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.    Venue is proper in this Court under 28 U.S.C. § 1391. This Court may exercise personal jurisdiction over defendant Fidelity as it has a principal place of business in New York, New York. Personal jurisdiction also is appropriate over CNA as it conducts extensive business in New York, New York.

## FACTUAL BACKGROUND

I.    THE INSURANCE POLICY

10.    Fidelity and CNA sold Plaintiffs an excess umbrella liability insurance policy which requires the insurance company to pay on behalf of the insured for losses covered under the Fidelity insurance policy, provided the underlying insurance company's policy limits have been exhausted.

11.    Fidelity policy no. CXU-001807 ("the Policy") was in effect from June 1, 1994 through June 1, 1995 and provides a per occurrence and annual aggregate limit of $10,000,000.00. The Policy sits above the Westchester Fire Insurance Company's ("Westchester") umbrella policy, which provides a per occurrence and annual aggregate limit of $15,000,000,00.

12.    The Policy follows form to the underlying Westchester policy except as pursuant to the terms and conditions provided within the Policy.

13.    Pursuant to the Policy, Fidelity and CNA promise to pay for damages resulting from "Bodily Injury" or "Property Damage" caused by an "Occurrence" that takes place during the policy period.

14.    Plaintiffs have paid all of the premiums due under the Fidelity Policy, which was in full force and effect at all pertinent times, and Plaintiffs have complied with all conditions in connection with the Policy.

II.    THE LOSS AND THE *HORIZON* CRUISE SHIP LITIGATION

15.    On about July 16, 1994, the cruise ship *Horizon*, owned and operated by a predecessor to Celebrity, suffered an outbreak of Legionnaires' disease (the "Incident").

16.    Passengers aboard the *Horizon* brought suit against Celebrity and Plaintiffs and others. Plaintiffs had manufactured and distributed the filter in the whirlpool spa where the jury determined the disease originated.

17.    Celebrity brought cross-claims against Plaintiffs for damages for attorneys fees, out-of-pocket costs and expenses, lost profits and lost enterprise value allegedly resulting from the Incident.

18.    The case has been litigated in installments. The liability issues— those arising out of Celebrity's claims as well as those related to the passenger claims—were tried in a single bellwether trial in May 2000. The jury returned a verdict in favor of the underlying passenger plaintiffs and against both Celebrity and Plaintiffs. The jury also found in favor of Celebrity on some of its claims against Plaintiffs.

III.     CELEBRITY'S DAMAGES CLAIMS

19.     In June 2006, Celebrity's damages phase of the trial proceeded against Plaintiffs and the jury returned a verdict against Plaintiffs, which the Court partially set aside. A second trial on damages was held in June 2007.

20.     Celebrity's damages claims were resolved with a final judgment entered against Plaintiffs in <u>Celebrity Cruise Line, Inc., et al v. Essef Corporation, et al</u>, Case No. 96 Civ 3135, U.S. Dist. Ct., S.D.N.Y., in the total amount of $30,435,226.00 on February 29, 2008.

21.     Plaintiffs must post a bond in order to stay execution on the judgment. Westchester has agreed to contribute a bond in the amount of $7,001,810.04 which represents the remainder of its policy limits. As such, the attachment point for Defendants' obligations under the Policy has been reached and exceeded, and the full $10,000,000.00 limits of the Policy are exposed.

22.     Plaintiffs' damages resulting from its liability in the *Horizon* Cruise Ship Litigation constitutes a covered loss under the Policy.

## DEMANDS ON DEFENDANTS

23.     No later than October 22, 1996, Plaintiffs provided timely notice to Fidelity and CNA regarding the underlying claims.

24.     On June 28, 2006, the first damage verdict was rendered in favor of Celebrity and against Plaintiffs.

25.     By letter dated December 11, 2006, Plaintiffs provided notice of that verdict under the Fidelity policies issued to Plaintiffs. That verdict would have reached and exhausted the Fidelity policy. Plaintiffs requested written confirmation that

coverage would be provided under the Fidelity policies for any judgment ultimately rendered against Plaintiffs in the *Horizon* Cruise Ship Litigation.

26.    To date, over a year and a half later, no such confirmation has been provided by Fidelity or CNA.

27.    By letters dated April 19, 2007 and May 21, 2007, Plaintiffs again requested written confirmation that coverage would be provided under the Fidelity or CNA policies.

28.    Again, no such confirmation has been provided by Fidelity or CNA.

29.    Instead, by letter dated September 21, 2007, Fidelity and CNA denied coverage and asserted exclusions and impediments to coverage that Defendants' alleged applied to Essef's claim.  Defendants' denial was based upon:  (a) the alleged application of the pollution exclusion clause; (b) the alleged application of the "Foreign Follow-Form" endorsement; and (c) the alleged failure to exhaust the limits underlying the Policy.

30.    On January 23, 2008, Plaintiffs sent a letter to Defendants refuting Fidelity's grounds for denying coverage.  Plaintiffs requested Defendants to reconsider their position and to acknowledge coverage.

31.    On March 5, 2008, Plaintiffs notified Defendants that Plaintiffs would have to post a bond staying execution of the judgment and requested that Fidelity post a bond.

32.    To date, Defendants have neither posted a bond nor agreed to provide coverage.

33.    Instead, by letter dated March 27, 2008, Defendants assert that it is Westchester's responsibility to pay the bond, thereby abandoning their policyholders.

34.    On March 31, 2008, Celebrity filed its Notice of Appeal in the *Horizon* Cruise Ship Litigation.  On April 10, 2008, Plaintiffs filed their Notices of Cross-Appeal.

35.    On April 10, 2008, Fidelity and CNA reconfirmed their denial of coverage and refusal to post a bond.

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

36.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 35 as if fully set forth herein.

37.    Fidelity and CNA have denied or failed to provide coverage for Plaintiffs for their losses from the Legionnaires' outbreak and the resulting *Horizon* Cruise Ship Litigation.

38.    Defendants' defenses to coverage are without factual or legal merit.

39.    By reason of the foregoing, an actual and justiciable controversy exists between Plaintiffs and Defendants regarding Fidelity and CNA's obligations to provide coverage for the losses Plaintiffs sustained as a result of the *Horizon* Cruise Ship Litigation.

40.    Plaintiffs seek a judicial declaration from this Court that: (i) Fidelity and CNA are obligated to perform their contractual obligations under the Policy, and (ii) that Plaintiffs are entitled to coverage, including a bond, for the losses sustained in the *Horizon* Cruise Ship Litigation.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

41.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 40 as if fully set forth herein.

42.    Plaintiffs have performed all of its terms and conditions under the Policy.

43.    Fidelity and CNA have breached the Policy by refusing or failing to honor the terms of the Policy and denying or failing to respond to requests to provide a bond or amounts due to Plaintiffs up to and including the full Policy limits under the terms of the Policy.

44.    As a result of Defendants' breach of their obligations under the Policy, Plaintiffs have suffered direct damages.

45.    Further, as a result of the *Horizon* Cruise Ship Litigation, Plaintiffs have sustained injury and monetary damages.

46.    Plaintiffs further have incurred costs and expenses by Fidelity's and CNA's failure to provide a bond or coverage up to the Policy limits.

47.    Defendants have asserted affirmative defenses including three exclusions claimed to preclude coverage, specifically (a) the alleged application of the "pollution exclusion" clause; (b) the alleged application of the "Foreign Follow-Form" endorsement; and (c) the alleged failure to exhaust underlying limits.  None of these alleged exclusions or alleged detriments in fact preclude coverage for Plaintiffs, and Plaintiffs have sustained injury and incurred costs by countering these assertions.

48.     Westchester has agreed to contribute the remainder of its policy limits, in the amount of $7,001,810.74, towards a bond for staying execution of the total judgment in the amount of $30,435,226.00.

49.     Fidelity and CNA are obligated to contribute to Plaintiffs the amount of $10,000,000.00, representing the full limits of the Policy limits for purposes of Plaintiffs' bond posted in connection with its motion to stay execution of the final judgment.

50.     By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and consequential damages, including but not limited to reasonable attorneys' fees and expenses and the fees relating to Plaintiffs' letter of credit, posted as security in lieu of bond, in amounts as yet to be ascertained and determined at trial.

### THIRD CLAIM FOR RELIEF
**(For Violation of New York State General Business Law § 349)**

51.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 50 as if fully set forth herein.

52.     Defendants, and their agents, servants and/or employees, are governed by regulations promulgated by the Superintendent of Insurance of the New York State Insurance Department as set forth in 11 N.Y.C.R.R. § 216, et seq., and under provisions of New York Insurance Law § 2601, prohibiting unfair claim settlement practices.

53.     In addition, Defendants, and their agents, servants and/or employees, are prohibited from engaging in deceptive acts and practices pursuant to § 349 of the General Business Law of the State of New York.

54.    The New York Insurance Law prohibits and/or requires certain action by insurance companies, their agents, and representatives and conduct by insurance companies, their agents and representatives who deviating from the following rules of play are deemed to have engaged in unfair claim settlement practices enumerated under New York Insurance Law § 2601:

(a)    Insurance Companies may not fail to adopt and implement reasonable standards from the prompt investigation of claims arising under their policies.

(b)    Insurance Companies may not fail to attempt in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear.

(c)    Insurance Companies may not compel policyholders to institute suits to recover amounts due under the policies by offering substantially less than the amounts ultimately recovered in suits brought by them.

55.    Moreover, New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York and make such acts and practices unlawful.

56.    Defendants, through their agents, servants and/or employees, have engaged in deceptive acts and practices in violation of § 349 of the General Business Law of New York by failing to have reasonable standards to effectuate prompt, fair and equitable settlements of Plaintiffs' liability loss claims, and as in this case, Defendants have failed to effectuate a prompt, fair and equitable settlement of Plaintiffs' claim even where liability is reasonably clear, all in violation of New York Insurance Law § 2601.

57.    Upon information and belief, moreover, Defendants engage in a practice of advertising, promoting and selling general liability policies of the type at issue

in this Complaint, all of which are consumer-oriented products that are designed and intended by Defendants to be purchased by the public at large in the State of New York.

58.    Defendants engage in the practice of advertising, promoting, and selling policies such as the Fidelity Policy by representing to the targeted public at large that inappropriately lulls consumers such as Plaintiffs into believing that Defendants are providing not only comprehensive insurance coverage but also fair and reasonable claim adjustment practices and procedures.

59.    The forms making up Fidelity's Excess Umbrella Liability Policy are consumer-oriented in that they are standard and regularly used by Fidelity and CNA in the inducement of consumers like Essef that are in search of insurance protection.

60.    Upon information and belief, Defendants engaged in a recurring pattern of selling standard language excess umbrella liability policies that afford coverage for damages owed to third parties, without warning said consumers that Defendants regularly and routinely engage in unfair claims settlement practices that are barred under 11. N.Y.C.R.R. § 216, et seq.

61.    Upon information and belief, when confronted with a policyholder's significant loss claim, Defendants regularly and routinely engage in the practice of inordinately delaying the settlement of the claim in violation of New York Insurance Law § 2601 and the regulatory support scheme for this law.

62.    Defendants' practice of advertising, promoting and selling policies such as the Fidelity Policy is deceptive and misleading to the public at large in that the policies contain contradictory, false and misleading terms and provisions that permit Defendants to deny or delay insurance coverage.

63.     Defendants' practice of advertising, promoting and selling policies such as the Fidelity Policy is deceptive and misleading to the public at large in that Defendants have adopted and implemented a practice of unreasonably delaying the claim adjustment process and unreasonably denying insurance coverage without justification.

64.     Defendants' practices as described harm the public at large in a material way by misleading the public at large to rely upon advertisements, promotions and products sold by Defendants when purchasing insurance coverage and by thwarting and frustrating the claims adjustment process with the intent and purpose of discouraging consumers of Defendants' insurance products from pursuing legitimate claims under policies sold by Defendants.

65.     Defendants' actions not only have caused injury to Plaintiffs, but, upon information and belief, have caused injury to numerous other similarly situated consumers and policyholders.

66.     Fidelity and CNA had a duty to handle Plaintiffs' claim under the Policy promptly, fairly and equitably.  In denying or failing to provide insurance coverage under the Policy they sold, Defendants failed to fulfill their obligations to their policyholder.

67.     Indeed, Plaintiffs have repeatedly demanded that Defendants provide them with the coverage they purchased.  Plaintiffs timely provided notice of the claim and Defendants responded with a statement refuting coverage.  Plaintiffs' rebuttal provided reasons based both on the factual circumstances of the Incident and policy language as to why Defendants' refusal to provide coverage was unfounded.

68.    Defendants further have failed in their duty to treat their policyholder fairly by asserting illegitimate defenses to Plaintiffs' claim for coverage.

69.    As a result of the final judgment against them, Plaintiffs now are obligated to post a bond and have advised Defendants of such obligation and requested contribution. Defendants have failed to contribute or respond fairly, instead only questioning the responsibility of other insurance companies to contribute to the bond. Defendants' failure to contribute to the bond has left their policyholders abandoned.

70.    Plaintiffs have been injured and damaged by reason of Defendants' deceptive and misleading acts and omissions in that where the insurer's liability was clear, Defendants failed to promptly and fairly settle and pay to Plaintiffs the amounts due as a result of the losses, and engaged, instead, in unfair claim settlement practices prohibited under New York law.

71.    Plaintiffs acted and relied in a reasonable manner upon Defendants' practices of advertising, promoting and selling policies when they purchased the Policy.

72.    As a direct and proximate result of the practices and acts of Defendants, Plaintiffs have incurred actual injury.

73.    By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and consequential damages, including but not limited to reasonable attorneys' fees and expenses and the fees relating to Plaintiffs' letter of credit, posted as security in lieu of bond, in amounts as yet to be ascertained and determined at trial.

## DEMAND FOR JURY TRIAL

74.    Plaintiffs hereby demand a trial by jury on all causes of action.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

75.    With respect to the First Cause of Action, a declaration that Fidelity and CNA are obligated to provide coverage, including a bond, in accordance with the terms of the Policy for losses sustained by Plaintiffs in connection with the *Horizon Cruise Ship Litigation.*

76.    With respect to the Second Cause of Action for breach of contract, an award against Fidelity and CNA of compensatory, direct and consequential damages, including costs of suit, attorneys' fees and costs, plus the full amount of the bond premium, in an amount to be determined at trial, plus pre and post-judgment interest.

77.    With respect to the Third Cause of Action under New York General Business Law § 349, an award against Fidelity and CNA of the remedies provided thereunder, including compensatory damages, direct and consequential, including costs of suit, attorneys' fees and costs, plus the full amount of the bond premium, in an amount to be determined at trial, plus pre and post-judgment interest.

78.    All other relief in law or equity that this Court may deem just and appropriate.

April 15, 2008

By:    _____

ANDERSON KILL & OLICK, P.C.
Robert M. Horkovich, Esq. (RH-2345)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 278-1000

ATTORNEY FOR PLAINTIFFS
PENTAIR WATER TREATMENT (OH)
COMPANY (FORMERLY KNOWN AS ESSEF
CORPORATION), PENTAIR WATER POOL &
SPA, INC. (F/K/A PAC-FAB, INC.) AND
PENTAIR WATER BELGIUM BVBA (F/K/A
STRUCTURAL EUROPE N.V. F/K/A SFC)

# Exhibit B

| RENEWAL OF | REWRITE OF | RANCH | PRODUCER | COMM.% | UDIT | KR/MS |
|---|---|---|---|---|---|---|
| CXU 001524 | | 45 | 6050 | 17.5% | YES ☐ NO ☒ | |

| Policy Issued by | Fidelity and Casualty Company of New York<br>180 Maiden Lane<br>New York, New York 10038 | A Stock Company<br>15 | Policy No.<br>CXU 001807 |
|---|---|---|---|

| Producer's Name and Address | Henry Ward Johnson<br>300 South Wacker Drive<br>Suite 2600<br>Chicago, IL 60606 | Producer's Code<br>45-6050 | Renewal of<br>CXU 001524 |
|---|---|---|---|

| ITEM 1<br>Insured Mailing Address | Essef Corporation<br>220 Park Drive<br>Chardon, OH 44024 | **Declarations Page** |
|---|---|---|

**Excess Umbrella Liability Policy**

| ITEM 2<br>Policy Period | Your policy takes effect on **June 1, 1994**<br>and ends on **June 1, 1995**<br>both at 12:01 A.M. standard time at your mailing address. |
|---|---|

| ITEM 3<br>Type of Coverage | Excess Umbrella Liability |
|---|---|

| ITEM 4<br>Underlying Insurance (designate Carrier and Policy Number) | Westchester Fire Insurance Company |
|---|---|

| ITEM 5<br>Limit of Liability | $10,000,000 each occurrence/$10,000,000 annual aggregate where applicable. |
|---|---|

| ITEM 6<br>Total Limits of Liability (all underlying Insurance Policies) | $15,000,000 each occurrence/$15,000,000 annual aggregate where applicable in excess of primary insurance. |
|---|---|

| ITEM 7<br>Premium | $30,000 FLAT |
|---|---|

Attached: Liab 8750
Dated At: Ohio
Date Iss: June 27, 1994

Endorsements are as listed on the Schedule of endorsements.

Countersignature by: _____

BRANCH UNDERWRITING

ms

LIAB 8751 (7/84)

The company named on the declarations page (a stock insurance company, herein called the company), in consideration of the payment of the premium, in reliance upon the statements in the declarations and subject to all of the terms of this policy, agrees with the insured named in the declarations as follows:

I.  To further indemnify the insured in accordance with the applicable insuring agreements of the underlying insurance against loss which exceeds the amount set forth in item 6 of the declarations, subject to the limit of liability set forth in item 5 of the declarations.

    The term "underlying insurance" shall be understood to mean the policy, including any renewal or replacement thereof, described in item 4 of the declarations.

II. This policy except as provided herein, is subject to all agreements, limitations and conditions, including rights and privileges granted and obligations imposed under the underlying insurance, and shall follow such insurance in all respects, including changes by endorsement provided the insured furnishes the company with copies of such changes within thirty (30) days after the effective date thereof. Should any change be made in the premium for the underlying insurance during the period of this policy, then the premium hereunder may be adjusted accordingly.

III. If aggregate limits are specifically stated in items 5 and 6 of the declarations, this insurance will apply in excess of reduced underlying insurance provided such reduction in the underlying

insurance is solely by payment of loss for occurrences during the period of this policy.

IV. This policy may be cancelled by the named insured by surrender thereof to the company or any of its authorized agents, or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective, it is being agreed, however, that in the event of cancellation or termination of any underlying policy or any renewal thereof, or any insurance afforded thereunder, this policy to the extent of such cancellation or termination, shall apply only in the same manner as it would have applied had such underlying policy or any insurance thereunder been maintained in force. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro-rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable thereafter, but payment of unearned premium is not a condition of cancellation.

---

## NUCLEAR ENERGY LIABILITY EXCLUSION  (BROAD FORM)

It is agreed that:

I. The policy does not apply:

A.  Under any Liability Coverage, to bodily injury or property damage;

    (1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance

Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required t maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, o had this policy not been issued would be,

entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expense incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if
 (1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;
 (2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
 (3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility, is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage at such nuclear facility.

II. As Used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid, or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (a) containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility.

"nuclear facility" means:

 (a) any nuclear reactor,
 (b) any equipment or device designed for (I) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
 (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
 (d) any structure, basin excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

In witness thereof, the company has caused this policy to be signed by Our Chairman and Secretary, but this policy shall not be binding upon the Company unless completed by the attachment of the declarations page and countersigned by a duly authorized representative of the Company.

_Secretary_

_Chairman_

INSURED Essef Corporation

ENDORSEMENT 1

PRODUCER Henry Ward Johnson                              POLICY NUMBER CXU 001807

## SCHEDULE OF ENDORSEMENTS

| END. NO. | TITLE | ENDORSEMENT I.D. | EDITION |
|----------|-------|------------------|---------|
| 1 | Schedule of Endorsements | CES 10289 | 4/92 |
| 2 | Pollution Exclusion | CES 12066 | n/a |
| 3 | Real & Personal Property CCC | CES 12015 | n/a |
| 4 | Foreign Follow-Form | CES 12026 | n/a |
| 5 | ERISA Exclusion | CES 12024 | n/a |
| 6 | Asbestos Exclusion | CES 12038 | n/a |
| 7 | Aircraft Products Exclusion | CES 12040 | n/a |
| 8 | Aircraft Following-Form | CES 12008 | n/a |

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON June 27, 1994

EFFECTIVE DATE: June 1, 1994                    COUNTERSIGNED BY:_____

ms   CES10289 (4/92)                                        AUTHORIZED REPRESENTATIVE

INSURED  Essef Corpora⁝ ⁊n

ENDORSEMENT 2

PRODUCER Henry Ward Johnson

POLICY NUMBER   CXU 001807

## POLLUTION EXCLUSION

This policy does not apply to any loss, cost or expense:

1.  arising out of the actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of **Pollutants**.

2.  for damages claimed for any testing for, monitoring, removal, containment, treatment, detoxification or neutralization of **Pollutants**.

This exclusion does not apply to loss, cost or expense sustained on the insured's premises caused by heat, smoke, or fumes from a **Hostile Fire**.

**Pollutants** means any noise, solid, semi-solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, mists, acids, alkalis, chemicals, biological and other etiological agents or materials, electromagnetic or ionizing radiation and energy, genetically engineered materials, teratogenic, carcinogenic and mutagenic materials, waste and any other irritant or contaminant. Waste includes any materials to be disposed, recycled, reconditioned or reclaimed.

**Hostile Fire** means one which becomes uncontrollable or breaks out from where it was intended to be.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON  June 27, 1994

EFFECTIVE DATE:  June 1, 1994

COUNTERSIGNED BY:_____

ms   CES12066

AUTHORIZED REPRESENTATIVE

INSURED   Essef Corporation

ENDORSEMENT  3

PRODUCER Henry Ward Johnson                                POLICY NUMBER   CXU 001807

## REAL & PERSONAL PROPERTY
## CARE CUSTODY AND CONTROL EXCLUSION

This policy does not apply to any loss, cost or expense for Property Damage to any real or personal property owned, rented, leased or occupied by any Insured or to any real or personal property in the care, custody or control of the Insured, or which the Insured is, for any purpose, exercising physical control.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON   June 27, 1994

EFFECTIVE DATE:   June 1, 1994                COUNTERSIGNED BY:_____

ms       CES12015                                        AUTHORIZED REPRESENTATIVE

INSURED  Essef Corporai  n

ENDORSEMENT  4

PRODUCER Henry Ward Johnson

POLICY NUMBER  CXU 001807

## FOREIGN FOLLOW-FORM

This policy does not apply to any loss, cost, or expense arising outside the United States of America, its territories or possessions or Canada unless insurance is provided by a policy listed in the Underlying Insurance Schedule, and then only to the extent that such coverage is afforded by that policy.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON  June 27, 1994

EFFECTIVE DATE:  June 1, 1994

COUNTERSIGNED BY:_____

1S    CES12026

AUTHORIZED REPRESENTATIVE

INSURED  Essef Corpora on

ENDORSEMENT  5

PRODUCER Henry Ward Johnson                           POLICY NUMBER  CXU 001807

### ERISA EXCLUSION

This policy does not apply to any loss, cost or expense arising out of any duties or responsibilities imposed upon the insured by the Employee Retirement Income Security Act of 1974, Public Law 93-406 (or any amendment or addition thereto).

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON  June 27, 1994

EFFECTIVE DATE:  June 1, 1994

COUNTERSIGNED BY:_____

ms      CES12024                                        AUTHORIZED REPRESENTATIVE

INSURED   Essef Corporation

ENDORSEMENT  6

PRODUCER  Henry Ward Johnson

POLICY NUMBER    CXU 001807

### ASBESTOS EXCLUSION

This policy does not apply to any loss, cost or expense which arises in whole or in part, either directly or indirectly, out of asbestos, whether or not the asbestos is airborne as a fiber or particle, contained in a product, carried on clothing, or transmitted in any fashion whatsoever, or is contained in or forms a part of any whole or component part of any building, building material, insulation product or any other product.

It is further understood and agreed that the aggregate limit of liability in any underlying insurance, self-insured retention or in any of the excess layers of insurance shall not, as respects coverage provided hereunder, be reduced by losses arising from such assessments.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT  Ohio

ON   June 27, 1994

EFFECTIVE DATE:   June 1, 1994

ns      CES12038

COUNTERSIGNED BY:_____

AUTHORIZED REPRESENTATIVE

INSURED  Essef Corporation

ENDORSEMENT  7

PRODUCER Henry Ward Johnson

POLICY NUMBER   CXU 001807

## AIRCRAFT PRODUCTS EXCLUSION

This policy does not apply to any loss, cost or expense arising out of the **Products Hazard** (including **Completed Operations**) for **Aircraft Products** or **Grounding** liability.

**Aircraft Products** includes **Aircraft** (including missiles or spacecraft and any ground support or control equipment used therewith), and any article furnished by the insured or their predecessors in business and installed in aircraft or used in connection with aircraft or for spare parts for aircraft, or tooling used for the manufacture thereof, including ground handling tools and equipment and also means training aids, instructions, manuals, blueprints, engineering or other data, and/or any article in respect of which engineering or other advice and/or service and/or labor have been given or supplied by the insured or their predecessors in business relating to such aircraft or articles.

**Products Hazard** includes personal injury or bodily injury (as provided by the policy to which this endorsement is attached) and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from the premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others.

**Completed Operations** includes personal injury or bodily injury (as is provided by the policy to which this endorsement is attached) and property damage arising out of **operations** or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury, bodily injury or property damage occurs after such has been completed or abandoned and occurs away from premises owned or rented to the Named Insured. **Operations** includes materials, parts or equipment furnished in connection therewith. **Operations** shall be deemed completed at the earliest of the following times:

   1.   when all **operations** to be performed by or on behalf of the Named Insured under the contract have been completed;

   2.   when all **operations** to be performed by or on behalf of the Named Insured at the site of the **operations** have been **completed**; or

Page -1-

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON    June 27, 1994

EFFECTIVE DATE:   June 1, 1994

COUNTERSIGNED BY:_____

ns      CES12040

AUTHORIZED REPRESENTATIVE

INSURED  Essef Corpora  on

ENDORSEMENT  7

PRODUCER  Henry Ward Johnson

POLICY NUMBER    CXU 001807

3.  when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**Operations** which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

**Aircraft** means any heavier than air or lighter than air craft designed to transport persons or property through the air.  The term **aircraft** includes equipment or craft intended in whole or in part for use outside the atmosphere.

**Grounding** shall mean the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, by reason of the existence of or alleged or suspected existence of any defect, fault or condition in such aircraft or any part thereof sold, handled or distributed by the insured or manufactured, assembled or processed by any other person or organization according to specifications, plans, suggestions, orders or drawings of the insured or with tools, machinery or other equipment furnished to such persons or organizations by the insured, whether such aircraft so withdrawn are owned or operated by the same or different persons or organizations.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT  Ohio

ON    June 27, 1994

EFFECTIVE DATE:    June 1, 1994

ns        CES12040

COUNTERSIGNED BY:_____

AUTHORIZED REPRESENTATIVE

INSURED  Essef Corpora  on

ENDORSEMENT  8

PRODUCER Henry Ward Johnson

POLICY NUMBER   CXU 001807

## AIRCRAFT FOLLOWING FORM

Except to the extent coverage is provided by underlying insurance as set forth in the Schedule of Underlying Insurance, this policy does not apply to any loss, cost, or expense arising out of the ownership, maintenance, operation, use, loading or unloading of any **aircraft**.

**Aircraft** means any heavier than air or lighter than air craft designed to transport persons or property through the air.  The term **aircraft** includes equipment or craft intended in whole or in part for use outside the atmosphere.

All other terms and conditions remain unchanged.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT Ohio

ON  June 27, 1994

EFFECTIVE DATE: June 1, 1994

ns     CES12008

COUNTERSIGNED BY:_____

_____
AUTHORIZED REPRESENTATIVE

# Exhibit C

*Westchester*
SPECIALTY GROUP

D E C L A R A T I O N   - T H E   D E F E N D E R   -   POLICY NUMBER
COMMERCIAL UMBRELLA         CUA-100297-0
POLICY

DATE ISSUED   JUNE 24, 1994              RENEWAL OR REPLACEMENT OF 524-213636
ITEM NAMED INSURED & ADDRESS
  1   ESSEF CORPORATION
      220 PARK DRIVE
      CHARDON                      OH 44024

-------------------------------------------------------------------------------
  2   POLICY PERIOD: POLICY COVERS FROM JUNE 1, 1994        TO JUNE 1, 1995
      12:01 A.M. STANDARD TIME AT THE NAMED INSURED'S ADDRESS STATED ABOVE.
-------------------------------------------------------------------------------
  3   COVERAGE IS PROVIDED BY                  REPRESENTATIVE:

      WESTCHESTER FIRE INSURANCE CO.           THE LONDON AGENCY, INC.
                                               SIX CONCOURSE PARKWAY
                                               SUITE 2700
                                               ATLANTA, GEORGIA 30328-5346

                                               1223300      0971
-------------------------------------------------------------------------------
  4   LIMIT OF INSURANCE - AS IN INSURING AGREEMENT V AND VI (THE LIMITS OF
      INSURANCE ARE THE AMOUNTS SHOWN BELOW)
      (A) EACH OCCURRENCE LIMIT                            $15,000,000.
      (B) GENERAL AGGREGATE LIMIT (OTHER THAN PRODUCTS/    $15,000,000.
          COMPLETED OPERATIONS)
      (C) PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT    $15,000,000.
      (D) COMBINED AGGREGATE LIMIT                         N/A.
      (E) SELF INSURED RETENTION                           $10,000.
-------------------------------------------------------------------------------
  5   POLICY JACKET, FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY AT
      INCEPTION (NUMBER AND EDITION DATE)
      JACKET NO. FM101.0.1108 (11-93)
      SCHEDULE OF UNDERLYING INSURANCE M36 (12-89)
      ENDORSEMENTS ARE AS DESCRIBED ON THE SCHEDULE OF ENDORSEMENTS
-------------------------------------------------------------------------------
  6   PREMIUM IS PAYABLE
          $299,000.00 IN ADVANCE ADJUSTABLE AT A RATE OF N/A
                      PER FLAT CHARGE
                      ANNUAL EXPOSURE IS ESTIMATED AT: N/A
          $299,000.00 ANNUAL MINIMUM PREMIUM

TAX: LOCAL               N/A

     SURPLUS
       LINES             N/A


                         COUNTERSIGNED BY _____
                                          AUTHORIZED REPRESENTATIVE

     THESE DECLARATIONS, TOGETHER WITH 'POLICY PROVISIONS - PART ONE,' AND
     ENDORSEMENTS, IF ANY, ARE ISSUED AS PART OF, AND IN THE COMPLETION OF
     THE ABOVE NUMBERED POLICY.
     OPER/UNDERWRITER NO. 548/097

QSC (9-87)                              NO FLAT CANCELLATIONS PERMITTED

Case 1:08-cv-03604-BSJ-JCF    Document 8-6    Filed 06/05/2008    Page 3 of 29


*Westchester*
SPECIALTY GROUP

THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

## SCHEDULE A — SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF POLICY | APPLICABLE LIMITS | INSURER POLICY NO. POLICY PERIOD |
|---|---|---|
| (A) "AUTOMOBILE" LIABILITY | "BODILY INJURY" & "PROPERTY DAMAGE" COMBINED SINGLE LIMIT $1,000,000.00  EACH "OCCURRENCE" | ROYAL #TBA 06-01-94/95 |

POLICY TYPE & SYMBOL
- ( ) BUS. AUTO _____
- ( ) GARAGE _____
- ( ) TRUCKERS _____
- ( ) _____

UNINSURED/UNDERINSURED MOTORIST
$-----N/A----- EACH "OCCURRENCE"

| (B) COMMERCIAL GENERAL LIABILITY | $725,000.00  EACH "OCCURRENCE" LIMIT | TRANSAMERICA #TBA 06-01-94/95 |
|---|---|---|
| | $2,000,000.00  GENERAL AGGREGATE LIMIT ( ) PER PROJECT/ LOCATION | |
| | $2,000,000.00  PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | |
| | $-----N/A----- POLICY AGGREGATE LIMIT | |
| | $2,000,000.00  PERSONAL & ADVERTISING INJURY LIMIT | |
| | $-----N/A----- FIRE DAMAGE LIMIT - ANY ONE FIRE | |

S.I.R. $275,000.00 EACH OCCURRENCE WITHOUT AGGREGATE

| COMPREHENSIVE GENERAL LIABILITY | "BODILY INJURY" & "PROPERTY DAMAGE" COMBINED SINGLE LIMIT $1,000,000.00  EACH "OCCURRENCE" $1,000,000.00  AGGREGATE WHEN APPLICABLE | HARTFORD #TBA 06-01-94/95 (CORPORATE OWNED CONDOOMINIUM) |
|---|---|---|

PAGE 1 OF 2

M36          (12-89)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER   CUA-100297-0
ISSUED TO   ESSEF CORPORATION

BY   WESTCHESTER FIRE INSURANCE CO.

| (C) STANDARD WORKERS COMPENSATION & EMPLOYERS LIABILITY | COVERAGE B - EMPLOYERS LIABILITY "BODILY INJURY" BY ACCIDENT $1,000,000.00   EACH "OCCURRENCE" "BODILY INJURY" BY DISEASE $1,000,000.00   EACH EMPLOYEE "BODILY INJURY" BY DISEASE $1,000,000.00   POLICY LIMIT | ROYAL #TBA 01-01-94/95 |
| --- | --- | --- |
| (D) FOREIGN GENERAL LIABILITY | $1,000,000.00 EACH OCCURRENCE LIMIT $1,000,000.00 GENERAL AGGREGATE $1,000,000.00 PRODUCTS/COMPLETED OPERATIONS AGGREGATE $1,000,000.00 PERSONAL & ADVERTISING INJURY LIMIT | CONTINENTAL #TBA 01-01-94/95 |
| (E) FOREIGN AUTOMOBILE LIABILITY | BODILY INJURY AND PROPERTY DAMAGE COMBINED SINGLE LIMIT $1,000,000.00 EACH OCCURRENCE | TRANS-CONTINENTAL #TBA 01-01-94/95 |

M36                         (12-89)

# COMMERCIAL UMBRELLA POLICY

## INTRODUCTION

arious provisions in this policy restrict coverage. Read he entire policy carefully to determine rights, duties nd what is and is not covered.

hroughout this policy, the words "you", "your" and "Named Insured" refer to any person or organization dentified as a "Named Insured" under INSURING AGREEMENT III, the words "Insured" or "Insureds" refer o any person or organization qualifying as an "Insured" nder INSURING AGREEMENT III and the words we", "us", "our" and "Company" refer to the COMPANY tated in Item 3 of the Declarations as providing this nsurance.

Other words and phrases that appear in initial capital etters and quotation marks have special meanings. Refer to INSURING AGREEMENT IV and other provi- ions of this policy for such meanings.

n consideration of the payment of premium and in eliance upon the statements in the Declarations and ubject to the limits of insurance set forth in INSUR- NG AGREEMENT V (the "Limits of Insurance"), the EXCLUSIONS, the CONDITIONS and the other terms of this policy, the Company agrees with the "Named nsured" to provide coverage, as follows:

## INSURING AGREEMENTS

### I. COVERAGE

(1) We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law, or assumed by the "Insured" under contract prior to the "Occur- rence", shall become legally obligated to pay as damages for:

    (a) "Bodily Injury";

    (b) "Property Damage";

    (c) "Personal Injury"; or

    (d) "Advertising Injury";

arising out of an "Occurrence" during the POLICY PERIOD stated in Item 2 of the Declarations (the "Policy Period").

(2) The amount we pay for damages is limited as described in INSURING AGREEMENT V.

(3) If we are prevented by law or statute to "pay on behalf of the Insured", we will, in accordance with (1) & (2) above, indemnify the "Insured" for those sums in excess of the "Retained Limit".

### II. DEFENSE SETTLEMENT

(1) We shall have the right and duty to defend any "Claim" or "Suit" seeking damages covered by the terms and conditions of this policy when:

(a) the applicable limits of insurance of the un- derlying insurance policies set forth in Schedule A and to be maintained by you in accordance with Condition M of this policy (the "Underlying Insurance"), plus the applicable limits of other insurance have been exhausted by payments; or

(b) Damages are sought for "Bodily Injury", "Property Damage", "Personal Injury", or "Adver- tising Injury" which are not covered by "Under- lying Insurance" or other insurance.

(2) When we assume the defense of any "Claim" or "Suit", at our sole discretion we may investigate, negotiate and settle any "Occurrence", "Claim", "Suit" or trial. We will pay our expenses in addition to the applicable "Limits of Insurance" under this policy, subject to the provisions of subparagraph (5) below.

(3) We also have the following obligations, but only to the extent that they are not included in "Underlying Insurance" or other insurance:

(a) We will pay the premium for any bond required by law to release attachments for amounts not exceeding the applicable "Limits of Insurance"; but we are not obligated to apply for or furnish any such bond.

(b) We will pay the premium for all appeal bonds required by law to appeal any "Claim" or "Suit" we defend; but we are not obligated to apply for or furnish any such bond.

(c) We will pay all costs taxed against the "Insured" in any "Claim" or "Suit" we defend.

(d) We will pay all pre-judgment interest against the "Insured" attributable to that part of any judgment which we become obligated to pay; but our duty to pay such interest ends when we have offered to pay or deposited in court, the part of the judgment which we become obligated to pay and which is within the applicable "Limits of Insurance."

(e) We will pay all post-judgment interest against the "Insured" attributable to that part of any judg- ment which we become obligated to pay; but our duty to pay such interest ends when we have paid, or offered to pay or deposited in court, the part of the judgment which we become obligated to pay and which is within the applicable "Limits of Insurance".

(f) We will reimburse the "Insured" for expenses that are incurred at our request.

(4) We will not be obligated to investigate, negotiate, settle or defend any "Claim", "Suit" or trial brought

1989 Copyright by United States Fire Insurance Company

against, or applicable to, any "Insured" when:

(a) insurance is available to or collectible by the "Insured" under any "Underlying Insurance" or other insurance:

(b) the "Underlying Insurance" is not available or collectible because of the bankruptcy, insolvency or inability or failure to comply with any of its policy obligations of the underlying insurer(s) providing such "Underlying Insurance"; or

(c) the "Underlying Insurance" is not available or collectible because you did not maintain or meet the requirements of such insurance as warranted by, or you otherwise violated the provisions of. Condition M of this policy.

However, we will at our sole discretion, have the right and opportunity to associate and participate with you or any provider of "Underlying Insurance" or other insurance in the investigation, negotiation, settlement, defense or trial of any "Claim" or "Suit" reasonably likely to involve us under this policy. If we exercise such right. we will do so at our own expense.

(5) Notwithstanding the foregoing, our right and duty to defend under this INSURING AGREEMENT II ends when the applicable "Limits of Insurance", as stated in Item 4(a), 4(b), 4(c) or 4(d) of the Declarations. has been exhausted by our payments.

(6) If we are prevented by law or statute from complying with INSURING AGREEMENT II of this policy. we will reimburse the "Insured", for any expense incurred with our prior written consent.

## III. NAMED INSURED AND INSURED

(1) The term "Named Insured" as used herein means any individual or organization stated in Item 1 of the Declarations as a NAMED INSURED and:

(a) if you are an organization other than a partnership or joint venture, any of your subsidiary companies or any company over which you exercise control and actively manage:

(b) if you are an individual. your spouse. but only with respect to the conduct of the business of which you are sole owner: or

(c) if you are a partnership or a joint venture. your partners or members and their spouses. but only with respect to their conduct of your business.

(2) The term "Insured" as used herein means the "Named Insured" and:

(a) any person, organization, trustee or estate that has obligated you by written contract to provide the insurance that is afforded by this policy, but only with respect to liability arising out of "Your Work", "Your Product" and to property owned or used by you:

(b) at your option and subject to the terms of this

policy, any person, organization, trustee, or estate (other than the "Named Insured") included as an additional insured in the "Underlying Insurance". but only with respect to liability arising out of "Your Work", "Your Product", or property owned or used by you:

(c) your executive officers, directors and stockholders. but only within the scope of their duties as such:

(d) at your option and subject to the terms of this policy, any of your employees while within the scope of their employment to you, except for:

(i) "Bodily Injury" or "Property Damage" arising out of the use of an "Automobile", other than one owned by, loaned to, or hired by you;

(ii) "Bodily Injury" or "Personal Injury" to you or your co-employee while in the course of his or her employment, or the spouse, child, parent, brother or sister of that co-employee as a consequence of such "Bodily Injury" or "Personal Injury" or for any obligation to share damages with or repay someone else who must pay damages because of the injury.

(e) any person who has your permission to use an "Automobile" owned by, loaned to you, or hired for use by you, and any person or organization legally responsible for the use of that "Automobile": or

(f) any person (other than your employee) or any organization while acting as manager of your real estate.

## IV. DEFINITIONS

A. "Advertising Injury" means injury that arises out of your advertising activities as a result of:

(1) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods. products or services:

(2) oral or written publication of material that violates a person's right of privacy;

(3) misappropriation of advertising ideas or style of doing business; or

(4) infringement of copyright. title or slogan.

B. "Automobile" means a land motor vehicle. trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. "Automobile" does not include "Mobile Equipment" but does include self-propelled vehicles with the following types of permanently attached equipment:

(1) Equipment designed primarily for:

(a) snow removal:

(b) road maintenance. but not construction or

resurfacing; or

(c) street cleaning;

(2) cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

C. "Bodily Injury" means bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation, including resulting death.

D. "Claim" means any demand upon the "Insured" for monetary compensation, whether formal or informal, written or oral, including, without limitation, the service of "Suit" papers or arbitration proceedings against the "Insured" for monetary compensation alleging liability of the "Insured" as a result of an "Occurrence" which may or may not be covered by the policy. The term "Claim" does not include reports of accidents, or "Occurrences", or any acts, errors, offenses or omissions which may give rise to a "Claim" under this policy.

E. "Impaired Property" means tangible property, other than "Your Product", or "Your Work", that

(1) cannot be used or is less useful because:

(a) it incorporates "Your Product" or "Your Work" that is known or thought to be defective, deficient, inadequate, or dangerous; or

(b) you have failed to fulfill the terms of a contract or agreement; and

(2) can be restored to use by:

(a) the repair, replacement, adjustment, or removal of "Your Product" or "Your Work"; or

(b) your fulfillment of the terms of such contract or agreement.

F. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment, but does not include any vehicle defined as an "Automobile":

(1) bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2) vehicles maintained for use solely on or next to premises you own or rent;

(3) vehicles that travel on crawler treads;

(4) vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(a) power cranes, shovels, loaders, diggers or drills; or

(b) road construction or resurfacing equipment, such as graders, scrapers or rollers.

(5) Vehicles not described in subparagraph (1), (2), (3) or (4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b) cherry pickers and similar devices used to raise or lower workers;

(6) Vehicles not described in subparagraph (1), (2), (3) or (4) above maintained primarily for purposes other than the transportation of persons or cargo.

G. "Occurrence" means:

(1) An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "Bodily Injury" or "Property Damage" that is not expected or not intended by the "Insured".

All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "Occurrence".

(2) An offense that results in "Personal Injury".

All damages that arise from exposure to the same act, publication or general conditions are considered to arise from one "Occurrence".

(3) An act that results in "Advertising Injury".

All damages that arise from exposure to the same publication, misappropriation, infringement, harmful material or act are considered to arise from one "Occurrence" regardless of:

(a) the frequency of repetition;

(b) the number, kind or type of media used; or

(c) the number of claimants.

H. "Personal Injury" means injury, other than "Bodily Injury" and "Advertising Injury" arising out of the following offenses:

(1) false arrest, detention or imprisonment;

(2) malicious prosecution;

(3) wrongful eviction from a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, if done by or on behalf of its owner, landlord or lessor;

(4) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

(5) oral or written publication of material that violates a person's right of privacy; or

(6) discrimination.

I. "Products — Completed Operations Hazard" means:

(1) All "Bodily Injury" and "Property Damage" occurring away from premises you own or rent and arising out of "Your Product" or "Your Work" except:

(a) products that are still in your physical possession; or

(b) work that has not yet been completed or abandoned.

(2) "Your Work" will be deemed completed at the earliest of the following times:

(a) when all of the work called for in your contract or agreement has been completed;

(b) when all of the work to be done at the site has been completed, if your contract or agreement calls for work at more than one site; or

(c) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

For purposes of subparagraphs (1) and (2) above, work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(3) "Products/Completed Operations Hazard" does not include "Bodily Injury" or "Property Damage" arising out of:

(a) the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading (as defined in subparagraph (4) below) of it; or

(b) the existence of tools, uninstalled equipment or abandoned or unused materials.

J. "Property Damage" means:

(1) physical injury to tangible property, including all resulting loss of use of that property (all such loss of use shall be deemed to occur at the time of the physical injury that caused it); or

(2) loss of use of tangible property that is not physically injured (all such loss being deemed to occur at the time of the "Occurrence" that caused it).

K. "Retained Limit" means whichever of the following is applicable:

(1) with respect to any "Occurrence" that is covered by "Underlying Insurance" or any other insurance, the total of the applicable limits of the "Underlying Insurance" plus the applicable limits of any other insurance; or

(2) with respect to any "Occurrence" that is not covered by "Underlying Insurance" or any other insurance, the amount of the Self-Insured Retention stated in Item 4(e) of the Declarations (the "Self-Insured Retention").

L. "Suit" means a civil proceeding in which damages, because of "Bodily Injury", "Property Damage", "Personal Injury" or "Advertising Injury" to which this insurance applies, are alleged. "Suit" includes:

(1) an arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

(2) any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or

(3) an appeal of a civil proceeding.

M. "Underlying Insurance" means the policies listed in Schedule A — Schedule of Underlying Insurance and any other policies purchased or issued for any newly acquired or formed organization not more restrictive than the terms, conditions, endorsements, and limits of liability of the policies listed in Schedule A and to be maintained by you in accordance with Condition M of this policy.

N. "Your Product" means:

(1) any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) you;

(b) others trading under your name; or

(c) a person or organization whose business or assets you have acquired; and

(2) containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your Product" includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of items described in subparagraph (1) or (2) above and the

providing warranties or representations or failure to provide warnings or instructions.

"Your Product" does not include vending machines or other property rented to or located for the use of others, but not sold.

O. "Your Work" means:

(1) work or operations performed by you or on your behalf; and

(2) materials, parts or equipment furnished in connection with such work or operations.

"Your Work" includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of items described in subparagraph (1) or (2) above and the providing of or failure to provide warnings or instructions.

## V. LIMITS OF INSURANCE

A. The "Limits of Insurance" shown in the Declarations and the rules below fix the most we will pay, regardless of the number of:

(1) "Insureds";

(2) "Claims" made or "Suits" brought; or

(3) persons or organizations making "Claims" or bringing "Suits".

B. If there is a limit stated in Item 4(b) of the Declarations for the General Aggregate Limit (Other than Products/Completed Operations), that amount is the most we will pay for all damages under INSURING AGREEMENT I, except for: (1) injury and damage included in the "Products-Completed Operations Hazard" and (2) coverages included in the "Underlying Insurance" to which no underlying aggregate limit applies.

C. If there is a limit stated in Item 4(c) of the Declarations for the Products/Completed Operations Aggregate Limit, that amount is the most we will pay under INSURING AGREEMENT I for damages because of injury and damage included in the "Products/Completed Operations Hazard".

D. If there is a limit stated in Item 4(d) of the Declarations for Combined Aggregate Limit, that amount is the most we will pay under INSURING AGREEMENT I for all damages, except damages because of ownership or use of an "Automobile".

E. Subject to paragraphs B, C and D above, the Each Occurrence Limit stated in Item 4(a) of the Declarations is the most we will pay for damages for "Bodily Injury", "Personal Injury", "Property Damage" and "Advertising Injury" arising out of any one "Occurrence".

F. If the applicable limits of insurance of the "Underlying Insurance" or of other insurance are reduced or exhausted by payments from one or more "Occurrences" happening during the "Policy Period" of this policy, this policy will apply in excess of such reduced or exhausted limits.

G. The "Limits of Insurance" of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period, unless the policy period is extended after issuance of this policy for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding policy period for purposes of determining the "Limits of Insurance".

## VI. SELF-INSURED RETENTION

You will pay up to the amount of the Self Insured Retention, as stated in Item 4(e) of the Declarations, for any "Claims" or "Suits" covered by this policy and to which no "Underlying Insurance" or other insurance applies.

## VII. TERRITORY

This policy applies to "Occurrences" that happen anywhere.

# EXCLUSIONS

This policy does not apply to:

A. "Bodily Injury" or "Property Damage" expected or intended from the standpoint of the "Insured".

This Exclusion A does not apply to "Bodily Injury" resulting from the use of reasonable force to protect persons or property.

B. Any obligation for which the "Insured" or any of its insurers may be held liable under any workers compensation, unemployment compensation, disability benefits or similar laws.

C. "Bodily injury" or "Personal Injury" that:

(1) arises on the basis of race, creed, color, sex, age, national origin; or

(2) results in, or arises from, termination of employment.

D. "Property Damage" to any property owned by the "Insured".

E. "Property Damage" to "Your Product", arising out of it or any part of it.

F. "Property Damage" to "Your Work" arising out of it or any part of it and included in the "Products/Completed Operations Hazard".

This Exclusion F does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

G. "Property Damage" to "Impaired Property" or property that has not been physically injured arising out of:

(1) a defect, deficiency, inadequacy or dangerous condition in "Your Product" or "Your Work"; or

(2) a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This Exclusion G does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "Your Product" or "Your Work" after it has been put to its intended use.

H. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your Product";

(2) "Your Work"; or

(3) "Impaired Property",

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

I. "Advertising Injury" that results from:

(1) the failure to meet the requirements of a written contract or agreement;

(2) infringement on a registered trademark, service mark, or trade name by using such for goods or services sold, offered for sale, or advertised (other than such use of titles or slogans);

(3) incorrect description of any article or commodity; or

(4) a mistake in an advertised price.

J. (1) "Bodily Injury" or "Property Damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants (as defined below):

(a) that are, or that are contained, in any property that is:

(i) being moved from the place where such property or pollutants are accepted by the "Insured" for movement into or onto an "Automobile";

(ii) being transported or towed by the "Automobile";

(iii) otherwise in the course of transit by the "Insured";

(iv) being stored, disposed of, treated or processed in or upon the "Automobile"; or

(v) being moved from the "Automobile" to the place where such property or pollutants

are finally delivered, disposed of or abandoned by the "Insured"

(b) at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any "Insured";

(c) at or from any premises, site or location which is or was at any time used by or for any "Insured" or others for the handling, storage, disposal, processing or treatment of waste (as defined below);

(d) which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any "Insured" or any person or organization for whom any "Insured" may be legally responsible; or

(e) at or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such "insured", contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

(2) Any request, demand, order, "Claim", or "Suit" by the "Insured", a governmental authority, or others for payment under this policy for any loss, cost, or expense to test, monitor, clean-up, remove, contain, treat, detoxify, or neutralize, or any way respond to, or assess the effects of pollutants. To the extent that any of the above is determined to be "Bodily Injury" or "Property Damage", said "Bodily Injury" or "Property Damage" is also excluded.

For purposes of this Exclusion J, the term "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and the term "waste" includes materials to be recycled, reconditioned or reclaimed.

Subparagraphs (1)(a)(iv) and (1)(b) through (1)(e) of this Exclusion J do not apply to fuels, lubricants, fluids, exhaust gases or other similar pollutants that are needed for or result from the normal electrical, hydraulic or mechanical functioning of an "Automobile" or its parts if the pollutants escape or are discharged, dispersed or released directly from an "Automobile" part designed by its manufacturer to hold, store, receive or dispose of such pollutants.

Subparagraphs (1) (b) through (1) (e) of this Exclusion J do not apply to pollutants not in or upon an "Automobile" if:

(i) the pollutants or any property in which the pollutants are contained are upset, overturned or damages as a result of the maintenance or use of an "Automobile";

(ii) the discharge, dispersal, release or escape of the pollutants is caused directly by such upset, overturn or damage; and

(iii) the "Bodily Injury" or "Property Damage" resulting therefrom is not otherwise excluded under subparagraph (1) (a) of this Exclusion J.

Subparagraphs (1)(b) and (1) (e) of this Exclusion J do not apply to "Bodily Injury" or "Property Damage" arising out of smoke or fumes from a hostile fire. For purposes of this Exclusion J, a "hostile fire" means a fire which becomes uncontrollable or breaks out from where it was intended to be.

K. "Bodily Injury" or "Property Damage" arising out of the ownership, maintenance, operation, use, loading or unloading of aircraft or entrustment to others of any aircraft, except aircraft chartered with crew.

L. "Bodily Injury", "Personal Injury" or "Property Damage" that results from, or any condition that is incidental to, any of the following: (a) war, whether or not declared; (b) civil war; (c) insurrection; (d) rebellion; (e) revolution; or (f) warlike operations.

# CONDITIONS

A. Premium Computation. The rate, rating basis, and estimated units of exposure for the "Policy Period" will be stated in Item 6 of the Declarations. We will compute the premium for this policy by applying the rate to each unit of exposure of the rating basis. The estimated units of exposure will be used to determine the advance premium. The actual units of exposure will be used to compute the earned premium.

When this policy expires or if it is cancelled, we will compute the earned premium. If the earned premium is more than the advance premium, you will pay us the additional premium immediately. If the earned premium is less than the advance premium, we will return the excess premium to you. Regardless of the earned premium, the annual minimum premium stated in Item 6 of the Declarations will apply for each 12 months of the Policy Period.

B. Inspections and Surveys. We have the right, but are not obligated, to:

(1) make inspections and surveys at any time;

(2) give you reports on the conditions we find; and

(3) recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And, we do not warrant that conditions are safe or healthful or comply with laws, regulations, codes or standards.

This Condition B applies not only to us, but also to any rating, advisory, rate service or similar organization that makes insurance inspections, surveys, reports or recommendations.

C. Examination of Your Books and Records. We may examine and audit your books and records as they relate to this policy at any time during the Policy Period and for up to three years afterward.

D. Separation of Insureds. Except with respect to the "Limits of Insurance" and any rights or duties specifically assigned in this policy to the first NAMED INSURED stated in Item 1 of the Declarations (the "First Named Insured"), this insurance applies:

(1) as if each "Named Insured" were the only "Named Insured"; and

(2) separately to each "Insured" against whom a "Claim" is made or "Suit" is brought.

E. Duties in the Event of "Occurrence", "Claim" or "Suit".

(1) You must notify us of any "Occurrence" which may result in a "Claim" or "Suit" under this policy. Notice shall include:

(a) how, when and where the "Occurrence" took place;

(b) the names and addresses of any injured persons and witnesses; and

(c) the nature and location of any injury or damage arising out of the "Occurrence".

(2) If a "Claim" is made or "Suit" is brought against any "Insured" that is likely to involve this policy, you must notify us, in writing, of the "Claim" or "Suit" as soon as possible.

(3) You and any other involved "Insureds" must:

(a) immediately send us copies of any demands, notices, summonses or legal papers received in connection with any "Claim" or "Suit";

(b) authorize us to obtain records and other information;

(c) cooperate with us in the investigation, settlement or defense of any "Claim" or "Suit"; and

(d) assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any "Insured" because of injury or damage to which this insurance may also apply.

(4) No "Insureds" will, except at the own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

F. Appeals. If the "Insured" or any "Insured's" underlying insurer elects not to appeal a judgment that is in excess of the "Retained Limit", we may elect to do so at our own expense. In such case, we will pay all taxable costs, disbursements and interest, but we will not pay more than the applicable "Limits of Insurance" set forth in INSURING AGREEMENT V, plus taxable costs, disbursements and interest incidental to the appeal.

G. Loss Payments.

(1) We will have liability for any one "Occurrence" only when the amount of the "Retained Limit" with respect to such "Occurrence" has been paid by:

(a) the "Insured"

(b) us on behalf of the "Insured" (other than under this policy); or

(c) the "Insured's" underlying insurer.

(2) If we are obliged to indemnify the "Insured" for any payment of judgments or settlements, the "Insured" must make a written claim within 12 months of:

(a) actually paying any amount in excess of the "Retained Limit", or

(b) the "Insured's" liability being made certain by:

(i) the final judgment of a trial; or

(ii) the written agreement of the "Insured", the claimant and us.

If any later payments are made by the "Insured" for the same "Occurrence", written claim for these payments must likewise be made. We will reimburse you for these payments within 30 days of confirming that they are payable by this policy.

The "Insured" will reimburse us promptly for any amount of judgments and settlements paid on behalf of the "Insured" that is within the "Self-insured Retention".

H. Other Insurance. If there is any other collectible insurance available to the "Insured" (whether such insurance is stated to be primary, contributing, excess or contingent) that covers a loss that is also covered by this policy, the insurance provided by this policy will apply in excess of, and shall not contribute with, such insurance. This Condition H does not apply to any insurance policy purchased specifically (and which is so specified in such insurance policy) to apply in excess of this policy.

I. Transfer of Rights of Recovery Against Others to Us. If any "Insured" has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The "Insured" must do nothing to

impair these rights the transfer thereof to us. The "Insured" will cooperate with us and, at our request, will assist in the pursuit and enforcement of those rights.

If there is any money recovered, we will disburse that money, as follows:

(1) first, we will repay any actual payment made by the "Insured" that is in excess of the "Retained Limit";

(2) second, we will be repaid to the extent of our actual payment; and

(3) third, if any money remains, the "Insured" or any underlying insurer will be repaid to the extent of their actual payment.

If any expenses are incurred to recover money, we will share the expenses with the "Insured" or any underlying insurer in proportion to the amount that each is repaid.

If our recovery attempt is not successful, we will bear all of the recovery expenses.

J. Changes. This policy (including the Declarations and any schedules and endorsements attached hereto) contains all the agreements between you and us concerning the insurance afforded hereby. The first "Named Insured" shown in the Declarations is authorized to make changes in the terms of this policy, with our consent. This policy's terms and conditions can be amended or waived only by endorsement issued by us and made a part of this policy.

K. Transfer of Your Rights and Duties Under This Policy. Your rights and duties under this policy may not be transferred without our prior written consent, except in the case of death of an individual "Named Insured".

If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties, but only with respect to that property.

L. Cancellation.

(1) The first "Named Insured" may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first "Named Insured" written notice of cancellation at least:

(a) 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

(b) 30 days before the effective date of cancellation, if we cancel for any other reason.

(3) We will mail or deliver our notice to the first "Named Insured's" last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation and will be effective for all "Insureds". The "Policy Period" will end on that date.

(5) If this policy is cancelled, we will send the first "Named Insured" any premium refund due. The premium refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

**M. Maintenance of Underlying Insurance.** You agree:

(1) that the "Underlying Insurance" shall remain in force during the "Policy Period";

(2) that the terms, conditions and endorsements of the "Underlying Insurance" will not materially change; and

(3) that the limits of liability as warranted by Schedule A will not change, except for reduction or exhaustion in the aggregate or occurrence limits due to payments for "Occurrences" during the "Policy Period".

If you do not meet these requirements, this insurance shall apply as if the "Underlying Insurance" were available and collectible.

**N. Bankruptcy or Insolvency of Underlying Insurer.** For all purposes of this policy, if any "Underlying Insurance" is not available or collectible because of (a) the bankruptcy or insolvency of the underlying insurer(s) providing such "Underlying Insurance" or (b) the inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy, then this policy shall apply (and amounts payable hereunder shall be determined) as if such "Underlying Insurance" were available and collectible.

We have properly issued this policy, but it is not valid unless completed by the attachment of Declarations signed by our duly authorized representative.

## Westchester Fire Insurance Company

Dodge Biaett
Secretary

Richard A. Plazak
President

Dennis B Reding
Chairman of the Board

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This policy does not apply:

A. To "Bodily Injury," "Personal Injury" or "Property Damage":

   (1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had it's policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. To "Bodily Injury," "Personal Injury" or "Property Damage" or loss resulting from the hazardous properties of nuclear material, if:

   (1) The nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of an insured or (b) has been discharged or dispersed therefrom;

   (2) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   (3) The injury, sickness, disease, death, destruction or loss arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to injury to or destruction of or loss of property at such nuclear facility.

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by product material;

"source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (1) and (2) thereof;

"nuclear facility" means

   (1) Any nuclear reactor,

   (2) Any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packing waste,

   (3) Any equipment or device used for processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   (4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of or loss of property, the word "injury" or "destruction" or "loss" includes all forms of radioactive contamination of property.

All other terms and conditions of this policy remain unchanged.

Commercial Umbrella Policy







**Westchester Fire Insurance Company**
*A New York Corporation*
*Home Office: New York, NY*
*Licensed in all states*

# SCHEDULE OF ENDORSEMENTS

*Westchester*
SPECIALTY GROUP

POLICY NUMBER: CUA-100297-0
    EFFECTIVE: 06/01/94
        INSURED: ESSEF CORPORATION

| | TITLE | ENDORSE-MENT ID | REVISION DATE |
|---|---|---|---|
| 01. | OHIO AMENDATORY ENDORSEMENT | S62 | 12/89 |
| 02. | AMENDATORY ENDORSEMENT | M03 | 03/94 |
| 03. | ABSOLUTE ASBESTOS EXCLUSION | E75 | 08/90 |
| 04. | EXCLUSION OF DAMAGE TO PERSONAL PROPERTY | E49 | 12/89 |
| 05. | EXCLUSION OF DAMAGE TO REAL PROPERTY | E59 | 10/89 |
| 06. | POLLUTION LIABILITY EXCLUSION (ABSOLUTE – PRODUCTS AND COMPLETED OPERATIONS) | E13 | 10/90 |
| 07. | FELLOW EMPLOYEE LIMITATION | L11 | 12/89 |
| 08. | AIRCRAFT LIABILITY COVERAGE ENDORSEMENT LIMITATION | L27 | 12/90 |
| 09. | FOREIGN EXPOSURE LIMITATION | L13 | 12/89 |

024 (06/87)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


OHIO AMENDATORY ENDORSEMENT

THE FOLLOWING PROVISIONS ARE ADDED TO THE POLICY CANCELLATION CONDITIONS
AND SUPERSEDE ANY OTHER CONDITIONS TO THE CONTRARY:

I.  CANCELLATION

   (A)  AFTER THIS POLICY HAS BEEN IN EFFECT FOR MORE THAN NINETY DAYS,
        A NOTICE OF CANCELLATION FOR THIS POLICY SHALL NOT BE ISSUED UN-
        LESS IT IS BASED ON ONE OF THE FOLLOWING GROUNDS:

        (1)  NONPAYMENT OF PREMIUMS;

        (2)  DISCOVERY OF FRAUD OR MATERIAL MISREPRESENTATION IN THE PRO-
             CUREMENT OF THE INSURANCE OR WITH RESPECT TO ANY "CLAIMS"
             SUBMITTED THEREUNDER;

        (3)  DISCOVERY OF A MORAL HAZARD OR WILLFUL OR RECKLESS ACTS OR
             OMISSIONS ON THE PART OF THE "NAMED INSURED" THAT INCREASE
             ANY HAZARD INSURED AGAINST;

        (4)  THE OCCURRENCE OF A CHANGE IN THE INDIVIDUAL RISK WHICH SUB-
             STANTIALLY INCREASES ANY HAZARD INSURED AGAINST AFTER INSUR-
             ANCE COVERAGE HAS BEEN ISSUED OR RENEWED, EXCEPT TO THE EX-
             TENT THE INSURER REASONABLY SHOULD HAVE FORESEEN THE CHANGE
             OR CONTEMPLATED THE RISK IN WRITING THE CONTRACT;

        (5)  LOSS OF APPLICABLE REINSURANCE OR A SUBSTANTIAL DECREASE IN
             APPLICABLE REINSURANCE, IF THE SUPERINTENDENT HAS DETERMINED
             THAT REASONABLE EFFORTS HAVE BEEN MADE TO PREVENT THE LOSS
             OF OR SUBSTANTIAL DECREASE IN, THE APPLICABLE REINSURANCE,
             OR TO OBTAIN REPLACEMENT COVERAGE;

        (6)  FAILURE OF AN "INSURED" TO CORRECT MATERIAL VIOLATIONS OF
             SAFETY CODES OR TO COMPLY WITH REASONABLE WRITTEN LOSS CON-
             TROL RECOMMENDATIONS;

                         PAGE 1 OF 3

ENDORSEMENT NO. 1
S62                  (12-89)



*Westchester*
SPECIALTY GROUP

THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

       (7)  A DETERMINATION BY THE SUPERINTENDENT OF INSURANCE THAT THE
           CONTINUATION OF THE POLICY WOULD CREATE A CONDITION THAT
           WOULD BE HAZARDOUS TO THE POLICYHOLDERS OR THE PUBLIC.

    (B)  THE NOTICE OF CANCELLATION REQUIRED ABOVE IN PART A WILL BE IN
        WRITING, BE MAILED TO YOU AT YOUR LAST KNOWN ADDRESS, AND CON-
        TAIN ALL OF THE FOLLOWING:

        (1)  THE POLICY NUMBER;

        (2)  THE DATE OF THE NOTICE:

        (3)  THE EFFECTIVE DATE OF THE CANCELLATION;

        (4)  AN EXPLANATION OF THE REASON FOR CANCELLATION.
            SUCH NOTICE OF CANCELLATION ALSO SHALL BE MAILED TO YOUR
            AGENT.

    (C)  IF THIS POLICY HAS BEEN IN EFFECT FOR LESS THAN 90 DAYS, THE
        EFFECTIVE DATE OF CANCELLATION WILL BE NO LESS THAN THIRTY DAYS
        FROM THE DATE OF MAILING THE NOTICE.  WHEN CANCELLATION IS FOR
        NONPAYMENT OF PREMIUM, THE EFFECTIVE DATE OF CANCELLATION WILL BE
        NO LESS THAN TEN DAYS FROM THE DATE OF MAILING THE NOTICE.

    (D)  IF THIS POLICY IS ISSUED FOR A PERIOD GREATER THAN ONE YEAR, WE
        MAY ISSUE A NOTICE OF CANCELLATION OF THE POLICY AT LEAST THIRTY
        DAYS PRIOR TO THE ANNIVERSARY OF THIS POLICY, WITH THE EFFECTIVE
        DATE OF CANCELLATION BEING THAT ANNIVERSARY.

II.  NONRENEWAL

    (A)  WE MAY REFUSE TO RENEW THIS POLICY BY MAILING TO YOU AT YOUR LAST
        KNOWN ADDRESS, AT LEAST THIRTY DAYS PRIOR TO THE EXPIRATION DATE
        OF THIS POLICY, A NOTICE OF OUR INTENTION NOT TO RENEW THE
        POLICY.

PAGE 2 OF 3

ENDORSEMENT NO.  1
S62          (12-89)

*Westchester*
SPECIALTY GROUP

THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

SUCH NOTICE SHALL CONTAIN ALL OF THE FOLLOWING:

(1)  THE POLICY NUMBER;

(2)  THE DATE OF NOTICE;

(3)  THE EXPIRATION DATE OF THE POLICY.

(B)  IF THE NOTICE OF NONRENEWAL IS MAILED LESS THAN THIRTY DAYS BE-
FORE THE EXPIRATION DATE OF THE POLICY, YOUR COVERAGE THEN IN
EFFECT REMAINS IN EFFECT UNTIL THIRTY DAYS AFTER THE DATE OF
MAILING THE NOTICE, UNLESS YOU NOTIFY US IN WRITING THAT YOU
ACCEPT THE NONRENEWAL AS STATED. WE SHALL NOTIFY YOU OF THE
AMOUNT OF THE PREMIUM FOR THE TIME AFTER THE EXPIRATION DATE THAT
THE COVERAGE MAY REMAIN IN EFFECT, AND SHALL PAY SUCH PREMIUM
UNLESS YOU ACCEPT THE STATED NONRENEWAL. THE PREMIUM WILL BE
CALCULATED USING THE RATES ORIGINALLY APPLICABLE TO YOUR COVER-
AGE THEN IN EFFECT.

AUTHORIZED REPRESENTATIVE

PAGE 3 OF 3

ENDORSEMENT NO.  1
S62                        (12-89)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


DEFENDER AMENDATORY ENDORSEMENT


I.  INSURING AGREEMENT I., COVERAGE, IS AMENDED BY DELETING PARAGRAPH (1)
AND REPLACING IT WITH THE FOLLOWING:

    I.  COVERAGE

        (1)  WE WILL PAY ON BEHALF OF THE "INSURED" THOSE SUMS IN EXCESS
             OF THE "RETAINED LIMIT" WHICH THE "INSURED", BY REASON OF
             LIABILITY IMPOSED BY LAW, OR ASSUMED BY THE "INSURED" UNDER
             CONTRACT PRIOR TO THE "OCCURRENCE", SHALL BECOME LEGALLY
             OBLIGATED TO PAY AS DAMAGES FOR:

             (A)  "BODILY INJURY" OR "PROPERTY DAMAGE" OCCURRING DURING
                  THE POLICY PERIOD STATED IN ITEM 2 OF THE DECLARATIONS
                  ("POLICY PERIOD") AND CAUSED BY AN "OCCURRENCE";

             (B)  "PERSONAL INJURY" CAUSED BY AN OFFENSE COMMITTED DURING
                  THE "POLICY PERIOD"; OR

             (C)  "ADVERTISING INJURY" CAUSED BY AN ACT COMMITTED DURING
                  THE "POLICY PERIOD".

II. CONDITION M., MAINTENANCE OF UNDERLYING INSURANCE, IS AMENDED BY
DELETING PARAGRAPH (3) AND REPLACING IT WITH THE FOLLOWING:

        (3)  THAT THE LIMITS OF LIABILITY AS WARRANTED BY THE "UNDERLYING
             INSURANCE" WILL NOT CHANGE, EXCEPT FOR REDUCTION OR EXHAUS-
             TION IN THE AGGREGATE OR OCCURRENCE LIMITS DUE TO PAYMENTS
             FOR:

             (A)  "BODILY INJURY" OR "PROPERTY DAMAGE" OCCURRING DURING
                  THE "POLICY PERIOD" AND CAUSED BY AN "OCCURRENCE";

             (B)  "PERSONAL INJURY" CAUSED BY AN OFFENSE COMMITTED DURING
                  THE "POLICY PERIOD"; OR


                              PAGE 1 OF 2


ENDORSEMENT NO.  2
M03                      (03-94)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

        (C)  "ADVERTISING INJURY" CAUSED BY AN ACT COMMITTED DURING
            THE "POLICY PERIOD".

III.  DEFINITION I. IS AMENDED BY DELETING FROM PARAGRAPH (3), SUBPARA-
     GRAPH (A), THE FOLLOWING LANGUAGE:

           "(AS DEFINED IN SUBPARAGRAPH (4), BELOW)".

                                  AUTHORIZED REPRESENTATIVE

PAGE 2 OF 2

ENDORSEMENT NO.  2
M03              (03-94)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


ABSOLUTE ASBESTOS EXCLUSION


1.  THIS POLICY DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE",
    "PERSONAL INJURY", OR "ADVERTISING INJURY" IN ANY WAY OR TO ANY
    EXTENT ARISING OUT OF OR INVOLVING ASBESTOS, ASBESTOS FIBERS, OR ANY
    PRODUCT CONTAINING ASBESTOS OR ASBESTOS FIBERS.

2.  THIS POLICY DOES NOT APPLY TO "ECONOMIC LOSS", "DIMINUTION OF PROP-
    ERTY", "ABATEMENT COSTS", OR ANY OTHER LOSS, COST, OR EXPENSE INCLUDING
    "EQUITABLE RELIEF", IN ANY WAY OR TO ANY EXTENT ARISING OUT OF OR
    INVOLVING ASBESTOS, ASBESTOS FIBERS, OR ANY PRODUCT CONTAINING ASBESTOS
    OR ASBESTOS FIBERS.

3.  THIS POLICY PROVIDES NO COVERAGE FOR ANY FEES, COSTS, OR EXPENSES OF
    ANY NATURE WHATSOEVER IN THE INVESTIGATION OR DEFENSE OF ANY "CLAIM" OR
    "SUIT" ARISING OUT OF OR INVOLVING ASBESTOS, ASBESTOS FIBERS, OR ANY
    PRODUCT CONTAINING ASBESTOS OR ASBESTOS FIBERS.

FOR THE PURPOSE OF THIS EXCLUSION ONLY, THE FOLLOWING ADDITIONAL TERMS
ARE DEFINED:

"ABATEMENT COSTS" MEANS ANY ACTUAL OR POTENTIAL DAMAGES, COSTS, FEES, OR
EXPENSES, INCLUDING THE COSTS OF INSPECTION, REMOVAL, OR REPLACEMENT.

"DIMINUTION OF PROPERTY" MEANS THE DIMINISHING OR LESSENING IN VALUE
OF PROPERTY.

"ECONOMIC LOSS" MEANS ANY ACTUAL OR POTENTIAL DAMAGES, COSTS, FEES,
EXPENSES, OR LOST PROFITS ARISING OUT OF OR INVOLVING THE MANUFACTURE OR
UTILIZATION OF A GOOD OR PRODUCT.

"EQUITABLE RELIEF" MEANS ANY REMEDY OR RELIEF, INCLUDING RESTITUTION OR
INJUNCTIVE RELIEF, SOUGHT IN A COURT WITH EQUITABLE POWERS.


_____
AUTHORIZED REPRESENTATIVE


ENDORSEMENT NO.  3
E75              (08-90)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

EXCLUSION OF DAMAGE TO PERSONAL PROPERTY

THIS POLICY DOES NOT APPLY TO "PROPERTY DAMAGE" TO "PERSONAL PROPERTY" IN
THE CARE, CUSTODY OR CONTROL OF THE "INSURED" OR OVER WHICH THE "INSURED"
IS, FOR ANY PURPOSE, EXERCISING PHYSICAL CONTROL.

"PERSONAL PROPERTY" MEANS ALL PROPERTY OTHER THAN REAL PROPERTY.

                                        _____
                                        AUTHORIZED REPRESENTATIVE

ENDORSEMENT NO.  4
E49                (12-89)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


                    EXCLUSION OF DAMAGE TO REAL PROPERTY


THIS POLICY DOES NOT APPLY TO "PROPERTY DAMAGE" TO REAL PROPERTY LEASED TO,
RENTED TO, OCCUPIED OR MANAGED BY THE "INSURED".



                                        _____
                                        AUTHORIZED REPRESENTATIVE



ENDORSEMENT NO.  5
E59                (10-89)

*Westchester*
SPECIALTY GROUP

THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


POLLUTION LIABILITY EXCLUSION
(ABSOLUTE - PRODUCTS AND COMPLETED OPERATIONS)


EXCLUSION J OF THE POLICY IS AMENDED TO INCLUDE:

(1) (F) ARISING OUT OF THE "PRODUCTS - COMPLETED OPERATIONS
HAZARD".


_____
AUTHORIZED REPRESENTATIVE


ENDORSEMENT NO. 6
E13              (10-90)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

## FELLOW EMPLOYEE LIMITATION

AS RESPECTS "FELLOW EMPLOYEE INJURY", THIS POLICY IS LIMITED TO THE COVER-
AGE PROVIDED BY "UNDERLYING INSURANCE".  IF COVERAGE IS NOT PROVIDED BY
"UNDERLYING INSURANCE", COVERAGE IS EXCLUDED FROM THIS POLICY.

THE TERM "FELLOW EMPLOYEE INJURY" MEANS INJURY TO ANY EMPLOYEE OF AN
"INSURED" INJURED IN THE COURSE OF HIS OR HER EMPLOYMENT BY AN "INSURED"
AND WHICH IS CAUSED BY ANOTHER EMPLOYEE OF ANY "INSURED".

AUTHORIZED REPRESENTATIVE

ENDORSEMENT NO.  7
L11                (12-89)

*Westchester*
SPECIALTY GROUP

THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.

AIRCRAFT LIABILITY COVERAGE ENDORSEMENT LIMITATION

A.  EXCLUSION K OF THIS POLICY IS DELETED.

B.  WITH RESPECT TO "BODILY INJURY" OR "PROPERTY DAMAGE" ARISING OUT OF THE
OWNERSHIP, MAINTENANCE, OPERATION, USE, LOADING OR UNLOADING OF ANY AIR-
CRAFT OR ENTRUSTMENT TO OTHERS OF ANY AIRCRAFT, THIS POLICY IS LIMITED TO
THE COVERAGE PROVIDED BY THE "UNDERLYING INSURANCE" LISTED IN THE SCHEDULE
BELOW.

SCHEDULE OF "UNDERLYING INSURANCE"

| INSURER | POLICY NUMBER | POLICY PERIOD |
|---------|---------------|---------------|
| INA | TO BE ADVISED | 03-23-94/95 |

LIMITS OF LIABILITY
  "BODILY INJURY" EXCLUDING PASSENGERS    $_____EACH PERSON
                                          $_____EACH "OCCURRENCE"
  PASSENGER "BODILY INJURY" LIABILITY     $_____EACH PERSON
                                          $_____EACH "OCCURRENCE"

  "PROPERTY DAMAGE"                       $_____EACH "OCCURRENCE"
  SINGLE LIMIT
  "BODILY INJURY" AND "PROPERTY DAMAGE"   $5,000,000.00  EACH "OCCURRENCE"
  (X) INCLUDING PASSENGER "BODILY INJURY"
  ( ) EXCLUDING PASSENGER "BODILY INJURY"

---

IF COVERAGE IS NOT PROVIDED BY SUCH "UNDERLYING INSURANCE", COVERAGE IS
EXCLUDED FROM THIS POLICY.

C.  THIS POLICY SHALL NOT APPLY TO:
   1.  VOLUNTARY COVERAGE SUCH AS, BUT NOT LIMITED TO, ADMITTED LIABILITY;
       AND
   2.  "PROPERTY DAMAGE" TO ANY PROPERTY IN THE CARE, CUSTODY OR CONTROL
       OF THE "INSURED" OR OVER WHICH THE "INSURED" IS, FOR ANY PURPOSE,
       EXERCISING PHYSICAL CONTROL.

AUTHORIZED REPRESENTATIVE

ENDORSEMENT NO.  8
L27                (12-90)



THIS ENDORSEMENT EFFECTIVE JUNE 1, 1994
FORMS PART OF POLICY NUMBER  CUA-100297-0
ISSUED TO  ESSEF CORPORATION

BY  WESTCHESTER FIRE INSURANCE CO.


FOREIGN EXPOSURE LIMITATION


INSURING AGREEMENT VII. TERRITORY IS HEREBY DELETED AND REPLACED BY THE
FOLLOWING:

VII. TERRITORY


THIS POLICY APPLIES TO "OCCURRENCES" THAT HAPPEN WITHIN THE UNITED STATES,
ITS TERRITORIES, POSSESSIONS OR CANADA.

WITH RESPECT TO "BODILY INJURY", "PROPERTY DAMAGE", "PERSONAL INJURY", OR
"ADVERTISING INJURY" FOR CLAIMS ARISING OUT OF "OCCURRENCES" HAPPENING OUT-
SIDE THE UNITED STATES, ITS TERRITORIES, POSSESSIONS OR CANADA THIS POLICY
IS LIMITED TO THE COVERAGE PROVIDED BY THE "UNDERLYING INSURANCE".

IF COVERAGE IS NOT PROVIDED BY "UNDERLYING INSURANCE", COVERAGE IS EXCLUDED
FROM THIS POLICY.


AUTHORIZED REPRESENTATIVE


ENDORSEMENT NO. 9
L13            (12-89)

# Exhibit D



1375 EAST NINTH STREET
ONE CLEVELAND CENTER
NINTH FLOOR
CLEVELAND, OH 44114
330.849.6648 DIRECT
216.623.0150 MAIN
216.623.0134 FAX
rlee@ralaw.com

December 11, 2006

Director, Casualty Claims
CNA International
CNA Plaza- 32 South
Chicago, Illinois  60685

Re:     Insured:     Essef Corporation
        Policies:     Fidelity & Casualty Policy No. CXU-001524, eff. 6/1/93 – 6/1/94
                     Fidelity & Casualty Policy No. L2713350, eff. 6/1/93 – 6/1/94
                     Fidelity & Casualty Policy No. CXU-001807, eff. 6/1/94 – 6/1/95
        *Celebrity Cruises, Inc. v. Essef Corp., et al.*
        United States District Court, Southern District of New York
        Case No. 96 CIV 3135

To Whom It May Concern:

The undersigned represents Essef Corporation in connection with certain insurance coverage matters arising out of the above-referenced litigation.  On June 28, 2006, the trial of this litigation ended with a verdict in favor of Celebrity Cruise Lines.  Enclosed for your information is a copy of the Special Verdict Form.  Due to post-trial motions, judgment has not yet been entered against Essef.

The purpose of this letter is to provide notice under the following Fidelity & Casualty policies issued to Essef Corporation, for any judgment against Essef which ultimately arises from this litigation:

        Foreign CGL Policy No. L2713350, effective 6/1/93 – 6/1/94;
        Excess Umbrella Policy No. CXU-001524, effective 6/1/93 – 6/1/94;
        Excess Umbrella Policy No. CXU-001807, effective 6/1/94 – 6/1/95.

For your information, I enclose a copy of the Amended Complaint filed by Celebrity Cruises against Essef.  I am also providing you with additional documentation which supports the trigger of coverage under these Fidelity & Casualty policies.  Specifically, enclosed is a copy of the Amended Complaint in the matter of *Arnold Litt, et al. v. Celebrity Cruises, Inc., et al.*  Plaintiff Arnold Litt was a passenger on a Horizon Cruise on December 29, 1993.  Also enclosed is a copy of the Second Amended Complaint

CLEVELAND   TOLEDO   AKRON   COLUMBUS   CINCINNATI   WASHINGTON, D.C.   TALLAHASSEE   ORLANDO   FORT MYERS   NAP¹
1386514 v_01 \ 067920.1216

www.ralaw.com                          DEC 2 0 2006

Page 2

filed in the matter of *John Bentzley v. Celebrity Cruises, et al.*, along with a copy of the Third-Party Complaint filed against Essef by Celebrity Cruises in the Bentzley litigation. Plaintiff John Bentzley was a passenger on a Horizon cruise, which departed on April 30, 1994. Also enclosed are copies of February 17, 1995 and November 5, 1995 records from the Centers for Disease Control and Prevention which identify that the outbreak of Legionnaire's disease was identified on twelve cruises which sailed from April 23, 1994 through July 16, 1994.

I also enclose for your information copies of two expert reports prepared on behalf of Celebrity Cruises. The first is a May 18, 2005 report from Standard & Poor's Corporate Value Consulting in which, on page 11, the reports state that passengers became ill on cruises from April 30 to July 9, 1994. The next report is that prepared on behalf of Celebrity by Eric Lerner, CPA and Joshua Harrison, CPA. This report itemizes the monetary damages claimed by Celebrity Cruises which include amounts Celebrity paid to passenger plaintiffs in settlements of their claims and by reason of judgment. The settlements/judgments paid by Celebrity include amounts paid to passengers who sailed on cruises which fall under the policy terms of the Fidelity & Casualty 1993-94 and 1994-1995 policies. You will also note in reviewing this expert report that Celebrity's claimed damages include litigation costs for defending the various passenger claims.

Accordingly, please provide your written confirmation that you will provide coverage to Essef Corporation under Fidelity & Casualty Policy No. L2713350 and No. CXU-001524, effective 6/1/93 to 6/1/94, and Policy No. CXU-001807, effective 6/1/94 to 6/1/95, for any judgment which is ultimately rendered against Essef in this litigation.

In addition, please provide us with copies of loss runs for all payments made under these three policies related to all of the Horizon Cruise/ Celebrity Cruises litigation. Thank you.

Very truly yours,

ROETZEL & ANDRESS, LPA

Ronald B. Lee
RBL/CLN:ag
Enclosures
cc:     Clifford C. Masch, Esq., Reminger & Reminger (w/encl.)

# Exhibit E

# REMINGER & REMINGER
### ATTORNEYS AT LAW

*Clifford C. Masch*
Direct Dial No.: 216/430-2164
Email: cmasch@reminger.com

September 21, 2007

Megan Faust
Roetzel & Andress
222 South Main Street
Akron OH 44308

RE:    Horizon Cruise Ship Litigation
      Our File No:     1891-22-37302-98

Dear Ms. Faust:

This letter is to acknowledge my receipt of your recent correspondence enclosing a copy of the special verdict form from the recent retrial of the litigation between Celebrity Cruise Line, Inc., et al. v. Esseff Corporation, et al. Let me preface this correspondence by advising you that CNA continues its investigation of the various policy numbers you have provided to our attention. As a result of the investigation, I have been able to obtain a copy of the Fidelity & Casualty Policy No. CXU-001524 which was in effect from 6/1/94 to 6/1/95. We have previously confirmed the existence of Fidelity & Casualty Policy No. CXU-001524 which was in effect from 6/1/93 through 6/1/94. To date, our investigation has not revealed any information relating to the existence of Fidelity & Casualty Policy No. L2713350. We will advise you if we uncover any information relative to this policy number.

I have already outlined our position as it relates to the potential exposure of Fidelity & Casualty Policy No. CXU-001524 in correspondence dated 2/5/07. Based on my review of the damages as set forth in the special verdict form in the retrial, I continue to believe that the 6/1/93 – 6/1/94 policy is not triggered by the recent jury damage findings. Stated simply, all of the damages identified in the special jury verdict form relate to events and exposures which take place after the expiration of Policy No. CXU-01524.

Turning now to the coverages contained in Fidelity & Casualty Policy number CXU-001807, I have enclosed a copy of this policy for your review. As you will see from your review, this policy provides excess umbrella liability coverage to Esseff Corporation for the effective dates of 6/1/94 through 6/1/95. The policy provides a $10,000,000.00 each occurrence limit, subject to a $10,000,000.00 annual aggregate. This coverage sits above the limits provided under the Westchester Fire Insurance umbrella policy of $15,000,000.000 each occurrence, subject to a $15,000,000.00 annual aggregate. The Westchester umbrella limits sit above the underlying primary policy. You will note that the Fidelity & Casualty policy follows form to the underlying umbrella policy except as pursuant to the terms provided within the Fidelity & Casualty policy. You will also note that the excess umbrella limits provided by the Fidelity & Casualty policy only apply in excess of exhaustion of the designated underlying coverage.

September 21, 2007
Page 2

With regard to the damages identified in the jury verdict form, I would draw your attention to Endorsement number 2 to the Fidelity & Casualty policy, which is entitled "pollution exclusion." This endorsement modifies the coverage provided under the policy as follows:

This policy does not apply to any loss, cost or expense:

1.  Arising out of the actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of **pollutants**.

2.  For money damages claimed for any treating for, monitoring, removal, contaminant, treatment, detoxification or neutralization of **pollutants**.

This exclusion does not apply to loss, cost or expense sustained on the insured's premises caused by heat, smoke, or fumes from a **hostile fire.**

**Pollutants** means any noise, solid, semi-solid, liquid, a gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, mist, acids, alkalis, chemicals, biological or other etiological agents or materials, electromagnetic or ionizing radiation and energy, genetically engineered materials, teratogenic carcinogenic and mutagenic materials, waste and other irritant or contaminant. Waste includes any materials to be disposed or recycled, reconditioned or reclaimed.

**Hostile fire** means one which becomes uncontrollable or breaks out from where it was intended to be.

All of the terms and conditions remain unchanged.

Separate and part from the foregoing, the Fidelity & Casualty policy also has a "Foreign Follow-Form" endorsement, Endorsement 4, which dictates that the policy does not apply to any "loss, cost or expense arising outside the United States of America, its territories or possession or Canada unless insurance is provided by a policy listed in the underlying insurance schedule, and then only to the extent that such coverage is afforded by that policy."

Based upon my review of the underlying allegations litigated in the Celebrity Cruise Line case, it is evident that all of the alleged damages in issue arise out of the actual, alleged or threatened release of a biological or etiological agents. Indeed, the Center for Disease Control has specifically identified Legionairres disease as an example of an "etiological" agent.

Separate and apart from the foregoing, to the extent that Westchester excludes coverage for any portion of the damages identified in the special interrogatories as being caused by or arising from events occuring outside the territorial waters of the United States, this same position

September 21, 2007
Page 3

would have application to any coverage provided under the Fidelity & Casualty excess umbrella policy.

Finally, even if one were to ignore the above-described policy exclusions, the coverage provided under the Fidelity & Casualty excess umbrella policy would not be trigged unless and until there was a complete exhaustion of the underlying limits of the Westchester umbrella policy as well as the underlying primary policy.

This letter is not intended to be a full discussion of each and every policy term and condition which may have application to the claims at issue in this case and Fidelity & Casualty specifically reserves the right to raise additional policy defenses pending further investigation. I assure you that I will keep up apprised of our continued investigation relative to the existence of Fidelity & Casualty policy number L2713350. Should you have any questions or concerns regarding anything discussed in this letter, please feel free to contact me at your convenience.

Very truly yours,

REMINGER & REMINGER CO., L.P.A.

Clifford C. Masch

CCM/mmj

# Exhibit F



222 SOUTH MAIN STREET
AKRON, OH 44308
330.849.6617 DIRECT
330.376.2700 MAIN
330.376.4577 FAX
lfaust@ralaw.com

January 23, 2008

Clifford C. Masch, Esq.
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115-1093

> Re:    Horizon Cruise Ship Litigation
>        Your File No. 1891-22-37302-98

Dear Cliff:

I write to provide you with our formal response to your September 21, 2007 letter.

Before I address the positions set forth in your letter, I want to update you on a court ruling from earlier this month. As you know, Celebrity Cruises, Inc. ("Celebrity") continues to pursue its damage claim against Essef Corp. ("Essef"). The first trial in 2006 resulted in a verdict against Essef for Celebrity's out-of-pocket expenses of $10.4 million. The additional verdicts for lost profits and lost enterprise value were reversed in January 2007. In the retrial in June 2007, the jury awarded Celebrity damages for lost profits of $15.2 million (after netting for amounts taken into account by the earlier verdict for out-of-pocket expenses). The recent ruling reduces the entire verdict by 30% and determines the interest rate for prejudgment interest. (A copy of the Order is enclosed.)

With respect to coverage, you confirm that Fidelity & Casualty policy no. CXU-001807 provides excess umbrella liability coverage to Essef for the effective dates of June 1, 1994 through June 1, 1995. The policy provides a $10 million each occurrence limit, subject to $10 million annual aggregate. This policy sits above the limits provided under the Westchester Fire Insurance ("Westchester") umbrella policy.

Nonetheless, you assert three potential hurdles to coverage under the Fidelity & Casualty policy: (a) the pollution exclusion clause; (b) the "Foreign Follow-Form" endorsement; and (c) exhaustion of the underlying limits of the Westchester umbrella policy.

Pollution Exclusion Clause: The pollution exclusion clause does not preclude coverage in this case. As you know, this litigation arises from the outbreak of Legionnaire's disease aboard the cruise ship Horizon which disembarked from New York City. At the liability phase of the case, it was found that Legionnaire's disease formed in a whirlpool spa and was inhaled by

Page 2

bathers. The Legionnaire's disease was caused by both a defective sand filter and the failure of the crew to utilize disinfectants properly.

Under the applicable case law, the pollution exclusion clause does not apply. "As a threshold matter, we believe that it is appropriate to construe the standard pollution exclusion clause in light of its general purpose, which is to exclude coverage for environmental pollution. Stoney Run Co. v. Prudential-LMI Commercial Insurance, 47 F.3d 34, 37 (2nd Cir. 1995). [C]ourts have held, and this Court agrees, that pollution exclusion clauses refer only to industrial and environmental pollution." Sphere Drake Ins. Co. v. Y.L. Realty Co., 990 F.Supp 240, 243 (S.D.N.Y. 1997); Herald Square Loft Corp. v. Merrimack Mutual Fire Insurance Co., 344 F.Supp 915 (S.D.N.Y. 2004).

In Herald Square Loft Corp., the court explained the rationale for only applying pollution exclusion clauses to environmental cleanups:

> Pollution exclusion clauses have a long history in New York insurance policies. See Belt Painting Corp., 100 N.Y.2d at 384-86, 763 N.Y.S.2d 790, 795 N.E.2d 15 (describing history of pollution exclusions in New York). During the 1970s, pollution exclusion clauses were required in all commercial and industrial liability policies in New York. See id. at 385, 736 N.Y.S.2d 790, 795 N.E.2d 15. From the beginning, these clauses were included in policies to hold corporate polluters responsible for their actions. Id.; see also Stoney Run co., 47 F.3d at 37; Sphere Drake Ins. Co., 990 F. Supp at 244. Over time, legislation and judicial decisions have caused the insurance industry to change the wording and extent of coverage of exclusion policies, but the general purpose of the clause, "to shield insurers from the costs of environmental cleanups," remains. Belt Painting Corp., 100 N.Y.2d at 386, 763 N.Y.S.2d 790, 795 N.E.2d 15.

Id. at 921.

In this case, the formation of Legionnaire's disease in the spas does not relate to industrial or environmental pollution. Thus, the pollution exclusion clause does not apply.[1]

Similarly, as defined under the case law, there has not been an "emission, discharge, disbursal, seepage, release or escape," as required under the policy to trigger the pollution exclusion clause. Terms such as these are terms of art of environmental law used in reference to injuries caused by disposal or containment of hazardous waste. Stoney Run Co., 47 F.3d at 37-38 ("The issue remains whether the pollution exclusion clause unambiguously includes injuries caused by exposure to carbon monoxide within an apartment. As set forth above, a reasonable interpretation of the pollution exclusion clause is that it applies only to environmental pollution, and not to all contact with substances that can be classified as pollutants. We hold that the release of carbon monoxide into an apartment is not the type of environmental pollution contemplated by the pollution exclusion clause.")

---

[1] The result under Ohio law would be the same. See e.g. Andersen v. Highland House Co., 93 Ohio St.3d 547 (2001).

Page 3

In <u>Sphere Drake Ins. Co.</u>, *supra*, the court reasoned:

> The language of the exclusion clause supports this interpretation. The clause discusses injuries caused by "discharge, dispersal, release or escape of pollutants." These are terms of art in environmental law, generally used to describe the improper disposal or containment of hazardous waste. <u>Tufco Flooring</u>, 409 S.E.2d at 699. These terms do not ordinarily encompass the type of "movement" associated with lead paint poisoning. Lead paint poisoning is not caused by "discharge, dispersal, release or escape;" rather, lead poisoning results from ingestion or inhalation of paint that has flaked over time. To extend the meaning of the clause to cover lead paint poisoning would require an overly broad interpretation of the above-quoted language inconsistent with accepted usage and the expectations of the contracting parties.

<u>Id.</u> at 243.

There has not been a release or discharge of the Legionnaire's disease as that term of art is used in environmental law. Therefore, for this additional reason, the pollution exclusion clause provides no basis for excluding coverage.

<u>Foreign Follow-Form Endorsement</u>: This endorsement does not exclude coverage. Presumably, based on your prior involvement, you are well aware that Essef has both a foreign and domestic primary policy for the relevant policy period. The Westchester umbrella policy sits on top of those policies. Westchester has never argued against coverage based on the loss arising outside of the United States. As such, this argument has no merit.

<u>Exhaustion of Underlying Policy</u>: The Westchester policy currently has about $7 million remaining. Westchester has tendered the full amount towards any judgment or settlement. Of course, based on the current verdict, the amount of the Westchester policy is exhausted, triggering the Fidelity & Casualty policy.

Based upon the above information, we ask that you reconsider your position and acknowledge coverage available under the Fidelity & Casualty policy. I would like to discuss this with you at your convenience.

Sincerely,

ROETZEL & ANDRESS, LPA

Laura M. Faust

LMF/tlc
Enclosure
368223 v_01 \ 067920.1318

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - :
                              :
CELEBRITY CRUISES INC., and   :    96 Civ. 3135 (JCF)
FANTASIA CRUISING INC.,       :
                              :
        Plaintiffs,           :        OPINION
                              :       AND ORDER
     - against -              :
                              :
ESSEF CORP., PAC-FAB, INC.,   :
and STRUCTURAL EUROPE N.V.    :
(f/n/a SFC),                  :
                              :
        Defendants.           :
- - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     When a number of passengers aboard the cruise ship Horizon
contracted Legionnaires' Disease in 1994, they brought suit against
Celebrity Cruises Inc. and Fantasia Cruising Inc. (collectively,
"Celebrity"), the owners and operators of the vessel, and against
Essef Corp., Pac-Fab, Inc., and Structural Europe N.V.
(collectively "Essef"), who had designed, manufactured, and
distributed the water filter in the whirlpool spa where the disease
originated.   Thereafter, Celebrity brought the instant action,
asserting claims against Essef for the economic damages that it
suffered as a result of the outbreak.

     This case has been litigated in installments.   Having agreed
to proceed before me for all purposes pursuant to 28 U.S.C. §
636(c), the parties stipulated to determination of all liability
issues -- those arising out of Celebrity's claims as well as those

1

related to the passengers' claims -- in a single bellwether trial. That trial took place in May 2000. The jury returned a verdict in favor of the passenger plaintiffs and against both Celebrity and Essef. The jury also found in favor of Celebrity on its claims against Essef, and a damages trial based on that determination was conducted in the spring of 2006. When the jury in the 2006 damages trial returned a verdict in favor of Celebrity for approximately $190 million, Essef moved for judgment as a matter of law or, in the alternative, for a new trial. I granted that motion in part, awarding judgment to Essef on one category of damage claims and ordering the retrial of another. <u>Celebrity Cruises Inc. v. Essef Corp.</u>, 478 F. Supp. 2d 440 (S.D.N.Y. 2007) ("Celebrity IV"). A second trial on damages was held in June 2007, and this time the jury found Essef liable to Celebrity for approximately $15 million in lost profits.

Three issues remain outstanding. First, Essef has moved pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law on Celebrity's lost profits claim. Second, Essef contends that any amount awarded against it should be reduced to reflect the jury's determination in the bellwether trial of Celebrity's comparative liability. Finally, Celebrity seeks an award of prejudgment interest on the amounts ultimately awarded. The facts pertinent to these issues will be discussed in connection

2

with each legal analysis.[1]

Judgment as a Matter of Law

A. Background

In the bellwether trial, the jury returned a verdict in favor of the passenger plaintiffs, finding both Essef and Celebrity responsible and assigning seventy percent of the liability to Essef and thirty percent to Celebrity. The jury also determined that Essef was liable to Celebrity for negligence, failure to warn, strict products liability, breach of express and implied warranties, negligent misrepresentation, and fraud.

Celebrity's damage claims were reserved for later determination. Those claims were divided into four categories. Category I included claims for indemnification of attorneys' fees, costs, and amounts paid to the passenger plaintiffs. Category II covered other out-of-pocket losses including refunds to passengers, expenses incurred as a result of the cancellation of cruises, and the costs of decontaminating the Horizon. Category III was comprised of lost profits from the date of the incident to the date

---

[1] The factual background is also set forth in more detail in prior decisions in this case and in opinions relating to the bellwether case. See Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355 (2d Cir. 2003); Celebrity IV, 478 F. Supp. 2d 440; Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169 (S.D.N.Y. 2006) ("Celebrity III"); Celebrity Corp. v. Essef Corp., No. 96 Civ. 3135, 2005 WL 3527142 (S.D.N.Y. Dec. 23, 2005) ("Celebrity II"); Celebrity Crusies Inc. v. Essef Corp., No. 96 Civ. 3135, 2004 WL 2591950 (S.D.N.Y Nov. 15, 2004) ("Celebrity I"); Silivanch v. Celebrity Cruises, Inc., 171 F. Supp. 2d 241 (S.D.N.Y. 2001).

3

when Celebrity was acquired by Royal Caribbean Cruise Lines ("RCCL") in 1997. And Category IV consisted of the allegedly diminished value of Celebrity at the time it was purchased by RCCL.

The Category I damage claims were settled or otherwise disposed of. At the first damages trial, the jury awarded Category II out-of-pocket damages of $10,435,669, and Essef did not challenge that determination in its post-trial motions. Celebrity IV, 478 F. Supp. 2d at 444. The same jury awarded $47,648,156 in lost profits under Category III, id. at 445, and I denied Essef's motion for judgment as a matter of law with respect to this aspect of the verdict, but granted its alternative application for a new trial. Id. at 449, 452. Finally, the same jury awarded Celebrity $135 million in lost enterprise value, id. at 445, but I granted Essef's post-trial motion for judgment as a matter of law and struck that portion of the verdict. Id. at 454.

At the first damages trial, Celebrity presented evidence of lost profits from a number of sources:

> First, it sought to demonstrate that the company had been stigmatized by the publicity it received as a result of the outbreak. Accordingly, it introduced numerous clippings from the print media as well as examples of broadcast coverage of the incident. Next, several former Celebrity officers and employees testified about the perceived effect of the Legionnaires' outbreak on bookings. They represented that demand had dropped after the incident and that travel agents were wary of booking their clients on Celebrity vessels. Finally, Celebrity's expert witness, [Robert] Schweihs, presented a model that quantified the company's lost profits attributable to the Legionnaires' incident. His analysis was based on the difference between the earnings before interest, taxes,

4

depreciation, and amortization ("EBITDA") that Celebrity
could reasonably have anticipated had there been no
outbreak and that which it actually realized. For the
period from July 1, 1994 to December 31, 1994, he used
projections prepared by Celebrity's management as
expected EBITDA. For the period from December 31, 1994
until Celebrity was sold in 1997, he estimated expected
EBITDA based on a "yardstick" consisting of three other
cruise lines: RCCL, Carnival Corp. ("Carnival"), and
American Classic Voyages. Mr. Schweihs then calculated
the difference between Celebrity's expected EBITDA and
its actual EBITDA for each year. Finally, he discounted
the stream of lost profits back to the date of the
incident. Using this model, he concluded that Celebrity
had suffered lost profits of $60.25 million.

Id. at 444 (citation and footnote omitted).

In deciding the post-trial motions, I criticized Celebrity's
proof in a number of respects. I noted that Celebrity had
presented no direct evidence of lost bookings after 1995 stemming
from the Legionnaires' incident. Id. at 448-49. It proffered no
survey evidence and failed to identify any potential passengers or
travel agents who declined to book a cruise out of fear or loss of
confidence in Celebrity. Id. By contrast, Essef presented proof
that occupancy levels had been restored by the last quarter of
1994, that the publically-traded co-owner of Celebrity did not
mention any economic impact of the outbreak in its board minutes or
its regulatory reports after 1994, and that Celebrity informed a
major creditor in late 1994 that the brand had not suffered long-
term damage. Id. at 449-50. I also found that Mr. Schweihs'
analysis was flawed because he had not sufficiently validated the
"yardstick" against which he measured Celebrity's profitability.

5

First, I noted that Celebrity did not have an adequate historical record to establish that its performance had paralleled that of the yardstick companies in the past. Id. at 451. Second, I observed that Mr. Schweihs had not provided compelling evidence that the yardstick companies he chose were sufficiently similar to Celebrity to warrant including them in the analysis. In particular, Carnival was a significantly larger, more diverse company that operated cruise itineraries different from Celebrity's, and American Classic Voyages offered unique cruise products in entirely distinct geographic markets. Id. at 451-52. On the basis of this analysis, I granted Essef's motion for a new trial. However, I also determined that "there is not such an absence of evidence supporting the jury's award of lost profits that judgment as a matter of law is warranted." Id. at 449.

At the second damages trial, Celebrity addressed at least some of my concerns. It produced anecdotal evidence of travel agents who, because of the Legionnaires' outbreak, did not arrange bookings with Celebrity for some period after 1995. For example, Richard Sasso, Celebrity's former President, testified that Bob Falcone, an agent in charge of some 230 salespeople, stopped booking with Celebrity after the incident and only resumed in late 1996. (Tr. at 1722-24).[2] Similarly, Cyril Hopkins, Celebrity's former Vice President in charge of pricing and revenue management,

---

[2] "Tr." refers to the transcript of the second damages trial.

6

described how some agents refused to do business with Celebrity immediately after the outbreak. (Tr. at 544-45). Further, he testified that an agent who had previously booked over $1 million worth of business with Celebrity stopped doing so because of the Legionnaires' event and only revived the relationship in 1996 or 1997. (Tr. at 595-98). Likewise, Mr. Hopkins recounted how another agent represented passengers who refused to cruise on the Horizon as late as 2000. (Tr. at 598-99).

At the second damages trial, Celebrity also supplemented its expert evidence. In addition to expounding the yardstick analysis that he presented at the first damages trial, Celebrity's expert witness, Mr. Schweihs, demonstrated how the addition of each component of the yardstick affected the results. He testified that if he utilized RCCL as the only comparator, he would calculate Celebrity's discounted lost profits for the 1994-1997 period to be $57,198,000. Then, if he included Carnival in the yardstick, lost profits would be $57,801,000. Finally, adding American Classic Voyages to restore the yardstick that he had originally adopted yielded a lost profits figure of $60,250,000. (Tr. at 1428-74; Pl. Exhs. 344C, 344H, 483, 484, 485, 486, 487, 494, 495, 496).

On the basis of the evidence presented at the second damages trial, the jury awarded Celebrity a total of $15,155,572 in lost profits. This amount was comprised of losses of $2,640,899 in 1994 and $12,514,673 in 1995. (Tr. at 2257-58). The jury determined

that Celebrity had suffered no lost profits during the years 1996
or 1997 attributable to the Legionnaires' incident.  (Tr. at 2258).

    B. Legal Standard

    Under Rule 50, judgment as a matter of law is warranted only
if "'(1) there is such a complete absence of evidence supporting
the verdict that the jury's findings could only have been the
result of sheer surmise and conjecture, or (2) there is such an
overwhelming amount of evidence in favor of the movant that
reasonable and fair minded [persons] could not arrive at a verdict
against [it].'" Advance Pharmaceutical, Inc. v. United States, 391
F.3d 377, 390 (2d Cir. 2004) (quoting Galdieri-Ambrosini v.
National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir.
1998) (alterations in original)); accord Schwartz v. Twin City Fire
Insurance Co., 492 F. Supp. 2d 308, 317 (S.D.N.Y. 2007).  The court
must view the evidence in the light most favorable to the party
opposing the motion and must defer to the credibility
determinations and reasonable inferences of the jury.  Reeves v.
Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000);
Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007); Mickle
v. Morin, 297 F.3d 114, 120 (2d Cir. 2002).  The court "may not
itself weigh the credibility of witnesses or consider the weight of
the evidence." Meloff v. New York Life Insurance Co., 240 F.3d
138, 145 (2d Cir. 2001) (quoting Galdieri-Ambrosini, 136 F.3d at
289); see also Reeves, 530 U.S. at 150.  And, "although the court

8

should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151; accord Zellner, 494 F.3d at 371; Mickle, 297 F.3d at 120.

### C. Application

Essef relies in large part on the purported failure of Celebrity to respond the criticisms that I leveled at its proof following the first damages trial. According to Essef:

> Although Celebrity argues that it presented additional exhibits and testimony in the 2007 Trial that purportedly addressed the Court's ruling about Celebrity's failure of proof in the 2006 Trial, the additional evidence Celebrity presents is no more probative than the evidence that the Court has already held was insufficient to link any alleged lost profits to the Incident. Because the same failure of proof still exists in 2007 as the Court held existed in 2006, Essef submits that the Court should grant Essef's motion for judgment as a matter of law.

(Reply Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law at 1). The flaw in this argument is that, while I granted Essef's previous motion for a new trial, I denied its motion for judgment as a matter of law with respect to lost profits. Therefore, if the evidence in the second damages trial was substantially the same as the evidence in the first, the shortcomings that I previously identified in Celebrity's proof would still not suffice to warrant judgment as a matter of law.[3]

---

[3] Interestingly, following the first damages trial, Essef moved for judgment as a matter of law on Celebrity's lost profits claims for the years 1996 and 1997, but sought only a new trial with respect to the jury's award of lost profits for 1994 and 1995.

In any event, Celebrity did buttress its proof at the second damages trial, as described above. Though hardly overwhelming, it presented some evidence that the stigma caused by the Legionnaires' outbreak motivated some travel agents to shy away from booking their clients on Celebrity well after the incident. More importantly, Mr. Schweihs addressed my doubts about the validity of his yardstick analysis. Essef's expert, Jeffrey Baliban, testified in both damages trials that RCCL, while not a perfect clone, was the yardstick company most comparable to Celebrity. (Tr. at 1835-36, 1867, 1964-69). Indeed, he used RCCL to make his own calculations of what Celebrity might have lost as a consequence of the Legionnaires' outbreak. (Tr. at 1867-81). However, he argued that adding other, less comparable companies to the yardstick had undermined its validity. (Tr. at 1867). At the second damages trial, Mr. Schweihs addressed this contention by testifying that a damages calculation using RCCL alone did not reach a significantly different result from an analysis using RCCL together with Carnival and American Classic Voyages. (Tr. at 1470, 1474). Moreover, the damages awarded by the jury were well below any of the alternative calculations offered by Mr. Schweihs, in part because the jury did not award any lost profits for 1996 or 1997.

To be sure, Essef did not allow the new evidence proffered by Celebrity to go unchallenged. It cast doubt on the

---

Celebrity IV, 478 F. Supp. 2d at 447.

10

representativeness and long-term significance of the evidence Celebrity presented concerning stigma. It continued to argue that all of the companies used in the yardstick model were too dissimilar from Celebrity for Mr. Schweihs' analysis to be valid. Finally, it took issue with other aspects of Mr. Schweihs' methodology. However, reviewing the record as a whole, I cannot say that the evidence was so overwhelmingly favorable to Essef that no reasonable jury could have reached the conclusion that this one did. Essef's motion for judgment as a matter of law is therefore denied.

Comparative Fault

A. Background

As noted above, the jury in the bellwether trial found both Essef and Celebrity liable for injury to the passenger plaintiffs and allocated seventy percent of the responsibility to Essef and thirty percent to Celebrity. The significance of that finding with respect to Celebrity's claims against Essef soon became a matter of dispute. When Celebrity sought to amend its complaint to specify its damages claims against Essef, Essef opposed the motion, arguing in part that Celebrity was not entitled to indemnification for damage payments made to passengers beyond the seventy percent Essef had already paid and that any out-of-pocket damages proven by Celebrity should likewise be reduced by thirty percent. Celebrity I, 2004 WL 2591950, at *2. Celebrity countered that Essef had

11

waived its right to a reduction of damages based on comparative fault, because, at the bellwether trial, it had never separately requested an allocation of responsibility with respect to Celebrity's claims against it. Id. I determined that it was unnecessary to resolve the waiver issue at that stage, noting that

> there is no doubt that Celebrity prevailed against Essef on its claim of fraud. The analysis of comparative fault with respect to an intentional tort is not coextensive with that relating to negligence claims, so there is no reason to assume that the jury's allocation with respect to the passengers' claims would apply; indeed, it may be that Essef is precluded altogether from arguing comparative fault as to the fraud claim.

Id. I therefore permitted Celebrity to amend its complaint and reserved these issues for summary judgment or trial. Id. at 2-3.

As the first damages trial approached, the parties did, indeed, cross-move for summary judgment, and Celebrity renewed its argument that "it is entitled to full indemnification from Essef because Essef failed at the bellwether trial to seek the jury's determination of Celebrity's comparative fault." Celebrity II, 2005 WL 3527142, at *3. However, I found that "the judgment entered in the bellwether case refers to findings of liability against Essef on Celebrity's tort claims but says nothing about indemnification." Id. at *4. I concluded that "[t]he relevant waiver, then, was not Essef's, but Celebrity's for failing to pursue its indemnification claims at the bellwether trial. Id. at *5. Accordingly, I denied Celebrity's motion for summary judgment.

Celebrity now argues, as it did on summary judgment in

12

connection with its indemnification claim, that Essef has waived its right to a reduction of damages by failing to seek a finding of comparative fault from the jury at the bellwether trial. Further, Celebrity contends that comparative negligence cannot be raised as a defense to fraud, and because it prevailed on its fraud claim against Essef, there can be no reduction of damages. In the context of this case, neither argument is persuasive.

B. Analysis

1. Waiver

At the bellwether trial, the jury was asked to allocate responsibility for the Legionnaires' outbreak and it did so by attributing seventy percent of the fault to Essef and thirty percent to Celebrity. Because the injuries for which Celebrity seeks compensation from Essef flow exclusively from that outbreak, the allocation of responsibility must be the same. There was therefore no need to request from the bellwether jury a separate verdict for comparative fault specifically with respect to Celebrity's claims against Essef. Indeed, had the jury been asked to do so, and had it found Celebrity's comparative negligence to be less than thirty percent with respect to its claims against Essef, that verdict would have been rejected as inconsistent with the jury's allocation of liability for the passenger plaintiffs' claims. See Crockett v. Long Island Railroad, 65 F.3d 274, 278 (2d Cir. 1995) (holding that irreconcilably inconsistent verdicts

13

cannot stand).

There is one respect in which the assignment of fault for injury to Celebrity might theoretically have deviated from the allocation of responsibility for injury to the passengers. Celebrity could have engaged in conduct after the outbreak that exacerbated its own damages. For example, it might have failed to take reasonable public relations steps to ameliorate the stigma. However, proof of such conduct could only have reduced the proportion of Essef's responsibility, not increased it. Thus, the bellwether jury's thirty percent allocation of responsibility to Celebrity with respect to the passenger claims acts as a ceiling for Essef's liability and, correspondingly, as a floor for the amount by which Essef's damages must be reduced. Therefore, Essef's failure to seek a more explicit verdict did not prejudice Celebrity.

The two collateral arguments that Celebrity offers in favor of its waiver theory do not undermine this reasoning. First, Celebrity contends that because the jury allocated responsibility on its claims against Essef among the three Essef entities, the absence of any such allocation of fault to Celebrity implies that none was intended. (Celebrity's Memorandum of Law in Opposition to Essef's Motion for Judgment as a Matter of Law and in Response to Essef's other Post-Trial Motions ("Celebrity Memo.") at 9-10). Yet, no additional allocation was necessary because, once the jury

14

determined that Essef was seventy percent liable, whether to the passengers or to Essef, the only remaining step was to determine how that responsibility should be divided among the Essef entities.

Second, Celebrity points out that in a legal malpractice action brought by Essef against its former counsel, Squire, Sanders and Dempsey LLP, Essef has argued that it was injured by the firm's failure to seek a jury determination of comparative fault with respect to Celebrity's claims against Essef. This, according to Celebrity, estops Essef from contending that it did not waive the right to avail itself of principles of comparative negligence. (Celebrity Memo. at 10). But nothing prevents Essef from pleading in the alternative by, as in this instance, asserting a contingent or hypothetical claim: if Essef is found to have waived comparative negligence, only then does it have a malpractice claim arising out of that failure. See Lawser v. Poudre School District R-1, 171 F. Supp. 2d 1150, 1158 (D. Colo. 2001) (finding that contingent claim is permissible hypothetical pleading). The predicate pled for that contingent claim, however, does not operate as a binding admission. See Henry v. Daytop Village, Inc., 42 F.3d 89, 95-96 (2d Cir. 1994); Ascher v. Target Corp., No. 05-CV-4826, 2007 WL 3287441, at *5 (E.D.N.Y. Oct. 15, 2007).

2. Comparative Negligence as a Defense to Fraud

There is some support for the proposition advanced by Celebrity that comparative negligence may not generally be raised

15

as a defense to fraud. Compare Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 575 (E.D.N.Y. 1999) ("Contributory or comparative negligence is not a defense to fraud.") and City of New York v. Corwen, 164 A.D.2d 212, 218, 565 N.Y.S.2d 457, 460 (1st Dep't 1990) ("In the past, contributory negligence clearly has not been regarded as a defense to intentional torts and that appears to remain the rule with respect to comparative negligence.") (citations omitted) with Bank Brussels Lambert v. Chase Manhattan Bank, N.A., No. 93 Civ. 5298, 1999 WL 710778, at *2 (S.D.N.Y. Sept. 10, 1999) ("There is no logical reason why, where an intentional tort on the part of the defendant is shown to be only a partial cause of a plaintiff's loss, the plaintiff should nevertheless also recover a further part of its loss shown to have been caused by its own negligence."). However, the cases that so hold involve circumstances where comparative negligence is asserted as a direct defense: the defendant is contending that even if he defrauded the plaintiff, the plaintiff was partially responsible for his own injury, for example, as a consequence of failing to put in place sufficient anti-fraud measures. See, e.g., Long Island Savings Bank, FSB v. Bigman, No. CV 89-0927, 1991 WL 144224, at *6-7 (E.D.N.Y. June 25, 1991) (finding that plaintiff's possible negligence in failing to detect defendant's fraud could not be asserted as defense); see also Corwen, 164 A.D.2d at 216-18, 565 N.Y.S.2d at 459-60

16

(defendants accused of bribery not permitted to argue plaintiff's negligent hiring and supervision of agent who extorted defendants as defense). Under these circumstances, courts are understandably reluctant to "blame the victim" by reducing the compensation to the defrauded party.

By contrast, in this case, the bellwether jury found Essef and Celebrity both responsible for the outbreak and for injury to the passenger plaintiffs. It was the outbreak, in turn, that caused stigma and ultimately economic injury to Celebrity. At this stage, Essef is not seeking to diminish its responsibility because of any negligence on Celebrity's part in failing to detect Essef's fraudulent conduct. Rather, Essef is contending that it should not be held liable for that portion of Celebrity's damages which flow from Celebrity's independent negligence in causing injury to the passengers, which in turn led to economic losses for Celebrity. Celebrity has not identified any case where a court has declined to adjust damages for comparative negligence in circumstances such as these. Celebrity's damages shall therefore be reduced by thirty percent to reflect its proportionate share of liability for the Legionnaires' incident.

Prejudgment Interest

    A. Interest Rate

This case arose under the admiralty jurisdiction of the Court. Therefore, even though New York state law determined the

17

substantive rights of the parties, federal law governs the award of prejudgment interest. Ennar Latex, Inc. v. Atlantic Mutual Insurance Co., No. 94 Civ. 150, 1995 WL 373444, at *1 (S.D.N.Y. June 21, 1995) (citing Middle East Engineering & Development Co. v. Arkwright-Boston Manufacturers Mutual Insurance Co., 675 F. Supp. 855, 856 (S.D.N.Y. 1987)); see also Hygrade Operators, Inc. v. Clifford, No. 96 Civ. 174928, 2000 WL 174928, at *5 (S.D.N.Y. Feb. 15, 2000). And, in admiralty actions, prejudgment interest should be awarded absent exceptional circumstances. See Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 310 (2d Cir. 1987); Ennar Latex, Inc., 1995 WL 373444, at *1. No such circumstances preclude an award of interest here.

The rate of interest to be applied lies in the discretion of the district court. See Ingersoll, 829 F.2d at 311; Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC, No. 04 Civ. 9651, 2007 WL 3125318, at *7 (S.D.N.Y. Oct. 23, 2007). The court should exercise that discretion with the goal of making the plaintiff whole. See OT Africa Line, Ltd. v. First Class Shipping Corp., 124 F. Supp. 2d 817, 823 (S.D.N.Y. 2000); National Shipping Co. of Saudi Arabia v. Diversified Freight Logistics, Inc., No. 02 Civ. 100, 2003 WL 22990096, at *10 (S.D.N.Y. Dec. 19, 2003).

Celebrity contends that it should be awarded interest at the average prime rate, compounded annually, or, at a minimum, at the statutory rate under New York law, nine percent. See N.Y. C.P.L.R.

18

§ 5004. Neither position is justified. While New York's statutory rate has the virtue of simplicity, it is ultimately arbitrary and not related to the losses actually suffered by Celebrity. Although I have noted, in connection with the passenger plaintiffs' claims, that "an ongoing business might be able to demonstrate that it could safely assume a rate of return approaching nine percent," Silivanch v. Celebrity Cruises, Inc., No. 95 Civ. 0374, 2000 WL 1211578, at *2 (S.D.N.Y. Aug. 25, 2000), Celebrity has not pointed to any evidence suggesting that it could have expected to be so profitable as to warrant utilization of either the New York statutory rate or the prime rate.

In general, "[a] plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration", 137 F.3d 94, 104 (2d Cir. 1998) (quoting Ingersoll, 829 F.2d at 311); see New York Marine & General Insurance Co. v. Tradeline, 266 F.3d 112, 131 (2d Cir. 2001). Accordingly, courts in admiralty cases commonly award interest at the average rate paid on six-month United States Treasury Bills. See Zerega Avenue Realty, 2007 WL 3125318, at *7; National Shipping Co. of Saudi Arabia, 2003 WL 22990096, at *10; OT Africa Line, 124 F. Supp. 2d at 823-24; Zim Israel Navigation Co. v. 3D Imports, Inc., 29 F. Supp. 2d 186, 193-94 (S.D.N.Y. 1998). The same result is appropriate here: interest shall accrue at the

19

average six-month Treasury Bill rate, compounded annually.

B. Tolling

Finally, Essef argues that exceptional circumstances warrant tolling the period for prejudgment interest.   The files of Celebrity's counsel were destroyed in the September 11, 2001 terrorist attack on the World Trade Center.   Accordingly, on January 25, 2002, I issued an order which, among other things, placed Celebrity's damage claim on the Court's suspense calendar until the files could be reconstituted.   Subsequently, on July 17, 2003, following the Second Circuit's decision dismissing the appeal of the bellwether case, I issued an order restoring Celebrity's damage claim to the active calendar and requiring fact discovery to be completed within six months of the issuance of a mandate by the Second Circuit.   The mandate was not issued until February 10, 2004.   In light of the resulting delay in entry of judgment, Essef contends that the accrual of prejudgment interest should be tolled for the period between January 25, 2002 and either July 17, 2003 or February 10, 2004.

In order to justify tolling the accrual of interest, however, it is not enough that the circumstances are exceptional; it must also be equitable to impose the economic burden on the prevailing party.   For example, if a plaintiff is responsible for delaying final resolution of a case, tolling the accrual of interest on the damage award won by that plaintiff may be fair.   That is not the

20

case here. Essef attributes the delay in obtaining a final verdict to two factors: the terrorist attack of 9/11 and the Second Circuit's delay in issuing a mandate. Celebrity, of course, was responsible for neither. In circumstances such as this, the risk of additional interest that accompanies a lapse of time should be borne by the party found liable rather than by the party wronged. Therefore, tolling the accrual of interest is not warranted.

<u>Conclusion</u>

For the reasons set forth above, Essef's motion for judgment as a matter of law is denied, the damages awarded to Celebrity shall be reduced by thirty percent to reflect its comparative fault, and interest shall be awarded at the average six-month Treasury Bill rate, compounded annually. Unless the parties agree on a form of judgment, Celebrity shall submit a proposed judgment within ten days of the date of this order, and Essef shall submit any counterproposal within five days thereafter.

SO ORDERED.

_James C. Francis IV_
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          January 4, 2008

21

Copies mailed this date:

Gregory O'Neill, Esq.
Mark M. Jaffe, Esq.
Elizabeth A. McCoy, Esq.
Mary T. Reilly, Esq.
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York  10281

Jeffrey C. Crawford, Esq.
Todd A. Bakal, Esq.
Douglas Eisenstein, Esq.
Renee M. Plessner, Esq.
Kenneth R. Lange, Esq.
Mound Cotton Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004

John S. Martin, Jr., Esq.
Martin & Obermaier
565 Fifth Avenue
New York, NY 10017

22

# Exhibit G



ROETZEL & ANDRESS

A LEGAL PROFESSIONAL ASSOCIATION

222 SOUTH MAIN STREET
AKRON, OH 44308
330.849.6617 DIRECT
330.376.2700 MAIN
330.376.4577 FAX
lfaust@ralaw.com

March 6, 2008

Clifford C. Masch, Esq.
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115-1093

Re:    Horizon Cruise Ship Litigation
Your File No. 1891-22-37302-98

Dear Cliff:

I write to update you on the status of this matter.

The final judgment in this case was signed by Magistrate Judge Francis and entered on the District Court docket on February 29, 2008. The total amount of the judgment is $30,435,226. (A copy is enclosed.)

It is now necessary to post a bond for the purpose of staying execution on the judgment. Westchester is contributing a bond in the amount of $7,001,810.74, which represents the remainder of its policy limits. As a result, all coverage underlying the Fidelity & Casualty policy has been exhausted.

I have not heard any response from you in connection with my January 23, 2008 letter. Consistent with our position, we believe that Fidelity & Casualty should contribute by posting a bond in the amount of its policy limits of $10,000,000.

I would like to discuss this with you. Please call me at your earliest convenience.

Sincerely,

ROETZEL & ANDRESS, LPA

Laura M. Faust

LMF/tlc
Enclosure

cc:    Rick Mitchell, Esq. (w/enclosure)
3751544_1 109107920.1318

MAR 1 0 2008



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

CELEBRITY CRUISES INC., and
FANTASIA CRUISING INC.,

        Plaintiffs,

    - against -

ESSEF CORP., PAC-FAB, INC., and
STRUCTURAL EUROPE N.V. (f/k/a SFC)

        Defendants.

------------------------------------------------x

Case No. 96 Civ 3135 (JCF)

**JUDGMENT**

#08, 0322

Defendants ESSEF CORP., PAC-FAB, INC., and STRUCTURAL EUROPE N.V. (f/k/a SFC) (collectively, "Defendants"), previously having been found liable to plaintiffs CELEBRITY CRUISES INC. and FANTASIA CRUISING INC. (collectively, "Plaintiffs") for punitive damages, and for fraud, failure to warn, strict liability, breach of express warranty, breach of implied warranty and negligent misrepresentation; and judgments having been entered against Defendants in favor of Plaintiffs, on March 27, 2002 in this action and on September 6, 2000 in a related case, *Silivanch v. Celebrity Cruises Inc., et al.* 95 Civ. 0374; and

The amount of Plaintiffs' compensatory damages in this action, having been brought on for trial before the Honorable James C. Francis, United States Magistrate Judge, and a jury, on June 12, 2006; and a verdict in favor of Plaintiffs having been rendered by the jury on June 28, 2006, which verdict was modified by Opinion and Order entered on January 18, 2007 in this action; and

{NY069514.1}

Certain of Plaintiffs' claims for damages having been brought on for retrial before Judge Francis and a jury, on June 11, 2007 in accordance with the terms of the Opinion and Order entered on January 18, 2007; and

A verdict in favor of Plaintiffs having been rendered by the jury in the retrial on June 28, 2007, and this verdict together with the June 28, 2006 verdict, having been modified by Opinion and Order entered on January 4, 2008 in this action;

It is hereby:

ORDERED, ADJUDGED, AND DECREED

1.  that Plaintiffs recover of and from Defendants, or any of them, the sum of $30,435,226, which sum consists of the following items of damages;

   a.  lost profits of $10,608,900 plus prejudgment interest through February 29, 2008 of $7,478,082 on that amount for a total of $18,086,982; and

   b.  out-of-pocket expenses of $7,304,959 plus prejudgment interest through February 29, 2008 of $5,043,285 on that amount for a total of $12,348,244;

Plaintiffs are awarded post judgment interest pursuant to Title 28 U.S.C. §1961 on the full amount of this judgment herein, and their taxable costs.

Dated: New York, New York
February 29, 2008

SO ORDERED:

_James C. Francis IV_
JAMES C. FRANCIS, IV
UNITED STATES MAGISTRATE JUDGE

CLERK OF THE COURT

By: _____

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

[NY060514.1]

# Exhibit H



Clifford C. Masch, Esq.
cmasch@reminger.com
Direct Dial: 216-430-2164

March 27, 2008

Megan Faust
Roetzel & Andress
222 South Main Street
Akron OH 44308

RE:    Horizon Cruise Ship Litigation
       Our File No:   1891-22-37302-98

Dear Megan:

Thank you for your recent correspondence in the above-captioned matter identifying the fact that it has now become necessary to post a bond for purposes of staying execution of judgment in the above-captioned matter.    I understand from your correspondence that Westchester is contributing a bond of approximately $7 million with represents the remainder of its policy limits.    Based upon our review of Westchester's commercial umbrella policy, it appears that Westchester may have an obligation to pay the premium for "all appeal bonds" required by law to appeal any "Claim" or "Suit" that Westchester defends.    Has your client taken the position that Westchester is not obligated to pay for the premium of all appeal bonds. We would appreciate your thoughts with regard to this issue.    Thank you.

Very truly yours,

**REMINGER & REMINGER CO., L.P.A.**

Clifford C. Masch

CCM/jms



REMINGER CO., LPA
1400 Midland Building • 101 Prospect Avenue West • Cleveland, OH 44115 • phone: 216.687.1311 • fax: 216.687.1841 • www.reminger.com
CLEVELAND / COLUMBUS / CINCINNATI / AKRON / SANDUSKY / TOLEDO / YOUNGSTOWN / FLORENCE, KY / LEXINGTON, KY

# Exhibit I



Clifford C. Masch, Esq.
cmasch@reminger.com
Direct Dial: 216-430-2164

April 14, 2008

Megan Faust
Roetzel & Andress
222 South Main Street
Akron OH 44308

RE:     Horizon Cruise Ship Litigation
        Our File No:   1891-22-37302-98

Dear Megan:

     In response to your correspondence of April 7, 2008, let me make it clear that for the reasons outlined in our prior correspondence, we continue to believe that any and all damages which are related to the federal action would be barred under the terms of the pollution exclusion. As we have already stated, this exclusion by its express terms, negates for coverage for damages arising from exposure to "etiological and biological agents." We have given due consideration to your citation to the Ohio Supreme Court's decision in *Anderson*, but note that the fundamental basis of that decision was the court's conclusion that carbon monoxide was not defined as a "pollutant" under the terms of the pollution exclusion involved in that case. The pollution exclusion contained in the Fidelity & Casualty policy in issue is different from that to the review in *Anderson*. More importantly, the pollution exclusion in the Fidelity & Casualty policy expressly defines a pollutant to include "etiological and biological agents."

     In light of the foregoing, Fidelity & Casualty will not agree to post a bond in the amount of its policy limits. I would also point out that Fidelity & Casualty would not have such an obligation even if this were a covered loss. Pursuant to Section II the Fidelity & Casualty 94-95 policy the Fidelity & Casualty coverage is subject to all agreements, limitations, conditions, including rights and privileges granted it and obligations imposed under the underlying insurance, except as provided in the Fidelity & Casualty policy. The underlying insurance is defined as the Westchester Fire Insurance policy in effect for the same time period. The Westchester policy contains the following language with respect to its obligations for an appeal bond:

     (3)  We also have the following obligations, but only to the extent they are not included in "underlying insurance" or other insurance:

     (b)  We will pay the premium for all appeal bonds required by law to appeal any "claim" or "suit" we defend: but we are not obligated to apply or furnish any such bond.



REMINGER CO., LPA
1400 Midland Building • 101 Prospect Avenue West • Cleveland, OH 44115 • phone: 216.687.1311 • fax: 216.687.1841 • www.reminger.com
CLEVELAND / COLUMBUS / CINCINNATI / AKRON / SANDUSKY / TOLEDO / YOUNGSTOWN / FLORENCE, KY / LEXINGTON, KY

April 14, 2008
Page 2

In sum, the language makes it clear that the extent of Fidelity & Casualty's responsibility relative to the posting of an appeal bond for a covered loss would, similar to Westchester, only relate to the premium for the bond.

Should you have any questions regarding this matter please do not hesitate to give me a call at your convenience.

Very truly yours,

**REMINGER & REMINGER CO., L.P.A.**

Clifford C. Masch

CCM/mmj